UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - v. -

DEWAYNE BARRETT, and
O'NEIL WRIGHT,

    Defendants.

SEALED
INDICTMENT

23 Cr. ____

23 CRIM 623

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### COUNT ONE
**(Major International Doping Fraud Conspiracy: BARRETT and WRIGHT)**

The Grand Jury charges:

1. From at least in or about November 2020, through in or about August 2021, in the Southern District of New York and elsewhere, DEWAYNE BARRETT and O'NEIL WRIGHT, the defendants, participated in a conspiracy to obtain misbranded, performance-enhancing drugs from a co-conspirator ("CC-1") for the purpose of providing those drugs to international athletes who anticipated competing in the upcoming 2020 Tokyo Olympics, which were held in the summer of 2021.

<u>Background to the Rodchenkov Anti-Doping Act ("RADA")</u>

2. On December 4, 2020, the President of the United States signed into law the Rodchenkov Anti-Doping Act, Pub. L. 116-206, incorporated into Title 21 of the United States Code at sections 2401 through 2404 ("RADA"). RADA prohibits "any person, other than an athlete, to knowingly carry into effect, attempt to carry into effect, or conspire with any other

person to carry into effect a scheme in commerce to influence by use of a prohibited substance or prohibited method any major international sports competition." 21 U.S.C. § 2402.

3. A "major international sports competition" is defined in RADA as a competition: "(i) in which one or more United States athletes and three or more athletes from other countries participate; (ii) that is governed by the anti-doping rules and principles of the Code [defined below]; and (iii) in which (I) the competition organizer or sanctioning body receives sponsorship or other financial support from an organization doing business in the United States; or (II) the competition organizer or sanctioning body receives compensation for the right to broadcast the competition in the United States." 21 U.S.C. § 2401(5). The "Code" referred to above is defined as the World Anti-Doping Code most recently adopted by the World Anti-Doping Association ("WADA") on March 5, 2003. *See* 21 U.S.C. § 2401(3).

4. The Olympic Games, as they were convened in Tokyo, Japan, in the summer of 2021, were among the "major international sports competitions" covered by RADA.

5. RADA defines "prohibited substance" by reference to the United Nations Educational, Scientific, and Cultural Organization International Convention Against Doping in Sport adopted in Paris on October 19, 2005, and ratified by the United States in 2008 (the "Convention"). *See* 21 U.S.C. § 2401(4), (7), (8). The Convention, in turn, includes a "Prohibited List" of substances as Annex I to the Convention. Among the substances on the Prohibited List are "anabolic agents," including testosterone and "any other substances with a similar chemical structure or similar biological effect(s)"; "Erythropoietins (EPO) and agents affecting erythropoiesis [*i.e.*, "blood builder" drugs intended to increase red blood cell count or oxygenation]; "peptide hormones and their releasing factors," including a category of "growth

hormone[s]," Chorionic Gonadotropin; and "Growth Factors and Growth Factor Modulators."[1] Each of the substances listed in this paragraph are expressly prohibited both "in- and out-of-competition."

### Background to the Food Drug Cosmetic Act

6.      The Food and Drug Administration ("FDA") enforces the federal Food Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq.* ("FDCA") which, among other things, governs the manufacture and drugs, including prescription drugs.

7.      Pursuant to the FDCA and related regulations, a drug may be deemed "misbranded" or "adulterated" for several reasons, including, as relevant here, if a drug requiring a prescription is administered without a valid prescription, that is, not in the usual course of a medical professional's practice, or not administered pursuant to any prescription at all.

### The Defendants' Scheme to Dope Athletes

8.      At all times relevant to the Indictment, DEWAYNE BARRETT and O'NEIL WRIGHT, the defendants, purported to coach athletes, including Olympic-level athletes competing on behalf of Nigeria ("Athlete-1"), Switzerland ("Athlete-2"), and the United Kingdom ("Athlete-3"), but instead, in order to obtain an unfair and unlawful advantage, BARRETT and WRIGHT provided those athletes with prohibited, performance-enhancing drugs that were obtained and administered without valid prescriptions.

9.      At all relevant times, DEWAYNE BARRETT, the defendant, was a track and field coach and personal trainer based in the New York City area who operated a fitness facility located in Manhattan. O'NEIL WRIGHT, the defendant, a former Olympic-level sprinter, was a track and

---

[1] *See* Convention, Annex I, *available at* https://unesdoc.unesco.org/ark:/48223/pf0000372368 (last visited November 20, 2023).

field coach based in Atlanta, Georgia. Neither BARRETT nor WRIGHT are doctors. CC-1, an individual who held himself out as a naturopathic doctor, but was not a licensed doctor, supplied drugs to athletes at BARRETT and WRIGHT's behest.

10. In or about June 2021, DEWAYNE BARRETT, the defendant, arranged for CC-1 to travel to the New York City area from Texas for the purpose of providing prohibited performance-enhancing substances to Athlete-2. Between on or about June 5 through June 7, 2021, BARRETT sent CC-1 multiple WhatsApp messages discussing CC-1's upcoming trip, including asking CC-1, in sum and substance, to bring human growth hormone "to nyc," and further discussed providing Athlete-1 with EPO and Clenbuterol. All three of those substances are prohibited under RADA. BARRETT also asked CC-1, in substance and in part, whether Athlete-3 could get "treatment in Texas," an allusion to CC-1's provision of prohibited drugs to Athlete-3. On or about June 7, 2021, CC-1 and Athlete-2 met in the vicinity of John F. Kennedy International Airport so that CC-1 could provide Athlete-2 the drugs BARRETT had requested. On or about June 14, 2021, CC-1 sent BARRETT a bill via text message for the drugs he had provided, totaling approximately $4,590.

11. On or about June 9, 2021, O'NEIL WRIGHT, the defendant, exchanged WhatsApp messages with CC-1 discussing, in substance and in part, CC-1's upcoming trip to Atlanta, Georgia, "the list" of prohibited drugs CC-1 should provide, and details regarding payment for those drugs. On or about June 14, 2021, CC-1 informed WRIGHT, in substance and in part, that he was flying into Atlanta that afternoon and bringing with him human growth hormone and EPO for Athlete-2. WRIGHT then directed CC-1 to meet with Athlete-2 in a hotel so that CC-1 could provide Athlete-3 with the drugs WRIGHT had requested. Weeks later, on or about June 23, 2021,

WRIGHT texted CC-1 and, in substance and in part, thanked CC-1 for "getting my athlete right," referencing the first name of Athlete-2.

## Statutory Allegations

12. From at least in or about November 2020, through in or about August 2021, in the Southern District of New York and elsewhere, DEWAYNE BARRETT and O'NEIL WRIGHT, the defendants, knowingly carried into effect, attempted to carry into effect, and conspired with others known and unknown to carry into effect a scheme in commerce to influence by use of a prohibited substance and prohibited method a major international sports competition, to wit, BARRETT and WRIGHT agreed, together and with others, to provide, and did provide, prohibited performance enhancing drugs, including but not limited to human growth hormone and EPO to athletes qualifying for and intending to compete in the 2020 Tokyo Olympics.

(Title 21, United States Code, Sections 2402 & 2403.)

## COUNT TWO
### (Conspiracy to Introduce into Interstate Commerce Adulterated and Misbranded Drugs and to Adulterate and Misbrand Drugs: BARRETT and WRIGHT)

The Grand Jury further charges:

13. The allegations contained in paragraphs One through Twelve of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

14. From at least in or about November 2020 through in or about August 2021, in the Southern District of New York and elsewhere, DEWAYNE BARRETT and O'NEIL WRIGHT, the defendants, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, violations of Title 21, United States Code, Sections 331 and 333(a)(2).

5

15. It was a part and an object of the conspiracy that DEWAYNE BARRETT and O'NEIL WRIGHT, the defendants, together and with others known and unknown, with the intent to defraud and mislead, would and did introduce and deliver for introduction, and would and did cause the introduction and delivery for introduction, into interstate commerce, of adulterated and misbranded drugs, as defined by 21 U.S.C. § 353(b)(1), in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).

16. It was further a part and an object of the conspiracy that DEWAYNE BARRETT and O'NEIL WRIGHT, the defendants, together and with others known and unknown, with the intent to defraud and mislead, adulterated and misbranded, and caused the adulteration and misbranding of, drugs in interstate commerce, as defined by 21 U.S.C. § 353(b)(1), in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).

**Overt Acts**

17. In furtherance of the conspiracy and to effect the illegal objects thereof, DEWAYNE BARRETT and O'NEIL WRIGHT, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

    a. On or about January 5, 2021, BARRETT sent CC-1 the following text messages, among others, "Hey [CC-1] i need a box of epo and 2 axicon to ship to a athlete asap," later writing "Hes focus in on the 200 but can run a good 400 and 100." CC-1 responded, "He will need 2 box of epo. 8000 iu per week for 6 weeks. He will run some crazy," "One box 300 two box $560," and "Axicon $90." EPO is a prohibited substance.

    b. As of at least in or about January 2021, a screenshot of a text

6

message exchange between BARRETT and CC-1 was saved to BARRETT's cellular phone. In the text message exchange captured in the screenshot, BARRETT texted CC-1, "What can I give my athlete to help them to get quick and fast for 100 meter," later texting, "No testing until August," "There from a small island." CC-1 responded, "do axcion," "phertamine," later texting, "more alert and explosive." Axcion phentermine is a stimulant that acts as an appetite suppressant. Phentermine and other substances with a similar chemical structure or biological effect are prohibited substances.

      c.      On or about June 2, 2021, CC-1 missed a group voice call via WhatsApp from BARRETT and Athlete-2. Subsequently, BARRETT messaged CC-1, "He wanted everything," "Prices." CC-1 responded via text message: "100 million stem cells at $1900," "Human Placent is $350," "Hgh 12 mg $450."

      d.      On or about June 7, 2021, CC-1, while in New York City, engaged in conversations with Athlete-1, who was coached by BARRETT, about CC-1's intent to travel from New York, to El Paso, Texas, and then to Florida, for the purpose of selling misbranded performance enhancing drugs to Athlete-1 and another athlete. Specifically, in the course of that conversation, Athlete-1 transmitted a voice message to CC-1, stating, in substance: "Hey [CC-1], I just sent you $2,500, can you confirm it via Zelle [an electronic payment application]? And also, remember I told you . . . [Athlete-4] had hurt his hamstring, so anything that will help the hamstring really heal fast you can actually bring it as well, ok?" After further discussing Athlete-1's payments to CC-1, Athlete-1 continued: "I had a bad race yesterday, [CC-1]," "11.02," "Upset, angry, and disappointed."

      e.      On or about June 14, 2021, CC-1 met with WRIGHT and Athlete-2 in Atlanta, Georgia, for the purpose of providing human growth hormone and erythropoietin, a

blood builder, to Athlete-2.

    f. As of at least in or about June 2021, a screenshot of a text message exchange between BARRETT and CC-1 was saved to BARRETT's cellular phone. In the text message exchange captured in the screenshot, CC-1 texted BARRETT, "I haven't receive any deposit from [Athlete-2]." BARRETT responded, "Ok ill contact [Athlete-2]," "But did he send any payments since he leave the usa ?" to which CC-1 responded, "Good day Dwight… he send the transfer when he arrived to Switzerland…I haven't receive any deposit yet." BARRETT later responded, "Was that deposit for nyc treatment or Texas treatment. Just want to be clear." CC-1 responded, "Atlanta." In a second screenshot appearing to reflect a continuation of the same text message exchange between BARRETT and CC-1, CC-1 sent BARRETT a screenshot reflecting a payment of $4,590, and later wrote, "Thank you."

    g. As of at least in or about March 2022, a screenshot of a text message exchange between BARRETT and Athlete-1 was saved to WRIGHT's iCloud account. In the text message exchange captured in the screenshot, BARRETT sent the following text messages to Athlete-1, among others: "What's me and oniel [*i.e.*, WRIGHT] role, how do you need us to help you and [Athlete-4] be gold medalist ?," and, "U ass need a drug coach," "U need a coach that will lie for you."

(Title 18, United States Code, Section 371.)

### COUNT THREE
**(Wire Fraud: BARRETT)**

The Grand Jury further charges:

18. Between in or about 2020 and 2021, DEWAYNE BARRETT, the defendant, used the identities of over 70 individuals to submit online applications seeking a total of over $2.5 million through a loan program of the United States Small Business Administration (the "SBA")

8

designed to provide relief to small businesses during the novel coronavirus/COVID-19 pandemic, namely, the Paycheck Protection Program (the "PPP"), by approving government-guaranteed loans issued by commercial lenders.

19. The SBA is a federal agency of the Executive Branch that administers assistance to American small businesses. This assistance includes guaranteeing loans that are issued by certain lenders to qualifying borrowers. Under the SBA loan guarantee programs, the actual loan is issued by a commercial lender, but the lender receives the full faith and credit backing of the United States Federal Government on a percentage of the loan. Therefore, if a borrower defaults on an SBA-guaranteed loan, the commercial lender may seek reimbursement from the SBA, up to the percentage of the guarantee. By reducing the risk to commercial lenders, the SBA loan guarantee programs enable lenders to provide loans to qualifying borrowers when financing is otherwise unavailable to them on reasonable terms through normal lending channels. When a borrower seeks an SBA-guaranteed loan, the borrower must meet both the commercial lender's eligibility requirements for the loan as well as the SBA's eligibility requirements.

20. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted on March 29, 2020 designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans through the PPP. On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act was signed into law, authorizing over $300 billion in additional PPP funding.

21. As part of the scheme, DEWAYNE BARRETT, the defendant, applied for PPP loans on behalf of individuals who he represented to be independent contractors on the loan

applications (the "Applicants"). In support of each respective loan application, BARRETT provided a falsified IRS Form 1040 that showed an inaccurate annual income for the relevant Applicant in the prior tax year. Each successful loan application resulted in the issuance of a loan or loans between approximately $20,000 and $29,000, totaling approximately $1.8 million in approved loans. In many cases, BARRETT was directly paid by the Applicant for having submitted the fraudulent paperwork, earning approximately $2,000 per loan.

22. As part of the scheme, DEWAYNE BARRETT, the defendant, submitted the following loan applications, among others:

a. On or about April 1, 2021, BARRETT submitted a loan application on behalf of another individual ("Applicant-1"), a Bronx resident, providing an IRS Form 1040 for tax year 2019 listing an income of $118,635. According to Applicant-1's New York State tax return, Applicant-1 reported an income for tax year 2019 of $32,171. Applicant-1 paid BARRETT $2,000 using the online payment platform Zelle in connection with this loan application.

b. On or about April 22, 2021, BARRETT submitted a loan application on behalf of another individual ("Applicant-2"), a Brooklyn resident, providing an IRS Form 1040 for tax year 2019 listing an income of $112,725. According to Applicant-2's New York State and federal tax returns, Applicant-2 reported an income of $2,745. Applicant-2 paid BARRETT $1,000 using the online payment platform CashApp in connection with this loan application.

c. In or about April 2021, BARRETT submitted a loan application on behalf of another individual ("Applicant-3"), a Georgia resident, providing an IRS Form 1040 for tax year 2019 listing an income of $108,300. According to Applicant-3's federal tax return for tax year 2019, Applicant-3 reported an income of $743. Applicant-3 paid BARRETT $2,355 in connection with the loan application.

Statutory Allegations

23.     From at least in or about 2020 through at least in or about 2021, in the Southern District of New York and elsewhere, DEWAYNE BARRETT, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, BARRETT applied for PPP loans guaranteed by the Small Business Administration on behalf of third parties using false income information, and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATIONS

24.     As a result of committing the offense charged in Count One of the Indictment, DEWAYNE BARRETT and O'NEIL WRIGHT, the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 2403(a)(2), any property real or personal, tangible or intangible, that was used or intended to be used, in any manner, to commit or facilitate a violation of said offense, and that constitutes or is traceable to the proceeds taken, obtained, or retained in connection with or as a result of a violation of said offense, including but not limited to a sum of money in United States currency representing the value of such property.

25.     As a result of committing the offense charged in Count Two of the Indictment, DEWAYNE BARRETT and O'NEIL WRIGHT, the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 334 and Title 28, United States Code, Section

2461(c), any and all drugs that were adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of section 331(ll), 344, or 355 of this title, have been introduced into interstate commerce, including but not limited to a sum of money in United States currency representing the value of such property.

26. As a result of committing the offense charged in Count Three of the Indictment, DEWAYNE BARRETT, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Asset Provision

27. If any of the above described forfeitable property, as a result of any act or omission of the defendants:

    a. Cannot be located upon the exercise of due diligence;

    b. Has been transferred or sold to, or deposited with, a third person;

    c. Has been placed beyond the jurisdiction of the Court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property.

(Title 21, United States Code, Sections 334, 853, and 2403, and Title 28, United States Code, Section 2461.)

_____  11/29/2023        _____
FOREPERSON                                             DAMIAN WILLIAMS
                                                       United States Attorney