UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

Plaintiff,

-v-

DEWAYNE BARRETT and O'NEIL WRIGHT,

Defendants.

Case No. 1:23-cr-00623 (JLR)

**<u>MEMORANDUM
OPINION AND ORDER</u>**

---

JENNIFER L. ROCHON, United States District Judge:

On November 29, 2023, Defendants Dewayne Barrett ("Barrett") and O'Neil Wright ("Wright") (together, "Defendants") were charged with participating in an international doping fraud conspiracy in violation of the Rodchenkov Anti-Doping Act (RADA) of 2019, 21 U.S.C. §§ 2402, 2403, and with conspiring to distribute misbranded performance-enhancing drugs in violation of the Food, Drug, and Cosmetics Act (FDCA) of 1938, 21 U.S.C. §§ 331, 333(a)(2). *See* Dkt. 2 ("Indictment" or "Ind."). Barrett is separately charged with wire fraud in connection with a scheme to fraudulently obtain loans through the Small Business Administration's ("SBA") Paycheck Protection Program (the "PPP"), a loan program launched during the COVID-19 pandemic, 18 U.S.C. §§ 2, 1343.

Now before this Court is Barrett's motion to (i) dismiss Count One of the Indictment, charging Defendants with an alleged violation of the RADA; (ii) sever Count Three from Counts One and Two at any future trial; and (iii) suppress evidence obtained from various searches of Barrett's electronic devices. Dkt. 47 ("Br."). Wright joins in Barrett's motion to dismiss Count One of the Indictment.[1]  For the reasons set forth below, Defendants' motion to

---

[1] On November 22, 2024, Wright filed a letter-motion with the Court requesting to join Barrett's Motion to dismiss Count One on the grounds that the "RADA is an unconstitutional delegation of legislative power and unlawfully vague" and "because, as an 'athlete,' Wright is not subject to the RADA's criminal prohibitions."  Dkt. 48.

dismiss Count One of the Indictment is DENIED.  Barrett's remaining motions are

GRANTED in part and DENIED in part.

## BACKGROUND

### I.    Factual Background

### A.    Underlying Conduct

According to the Indictment, "[f]rom at least in or about November 2020, through in

or about August 2021," Defendants engaged in a conspiracy to obtain and distribute

misbranded, performance-enhancing drugs to international athletes in the lead-up to the 2020

Tokyo Olympics, which were held in the summer of 2021.  Ind. ¶ 1.  Defendants were

working as coaches for Olympic-level athletes competing on behalf of Nigeria, Switzerland,

and the United Kingdom at the relevant time, and are charged with "provid[ing] those athletes

with prohibited, performance-enhancing drugs that were obtained and administered without

valid prescriptions."  Ind. ¶ 8.  The Indictment further alleges that Defendants conspired to

cause the introduction of  misbranded and adulterated drugs into interstate commerce, in

violation of the FDCA.  Ind. ¶¶ 14-16.

During the relevant time period, Barrett was a track and field coach and personal

trainer based in the New York City area, and operated a fitness facility located in Manhattan.

Ind. ¶ 9.  Wright, a former Olympic-level sprinter, was a track and field coach based in

Atlanta, Georgia.  Ind. ¶ 9.  Defendants obtained the misbranded, performance-enhancing

drugs from a co-conspirator ("CC-1"), an individual who "held himself out as a naturopathic

doctor, but was not a licensed doctor."  Ind. ¶¶ 1, 9.

The Indictment alleges various overt acts allegedly undertaken by Defendants in

furtherance of their conspiracies.  For instance, in or about June 2021, Barrett "arranged for

CC-1 to travel to the New York City area from Texas for the purpose of providing prohibited

performance-enhancing substances to Athlete-2," including human growth hormone, and discussed providing Athlete-1 with erythropoietins ("EPO"), and Clenbuterol. Ind. ¶ 10. On or about June 7, 2021, CC-1 and Athlete-2 met near the John F. Kennedy International Airport so that CC-1 could provide Athlete-2 with the drugs that Barrett had requested, and CC-1 subsequently sent Barrett a bill via text, totaling $4,590. Ind. ¶ 10. That same month, Wright corresponded with CC-1 regarding CC-1's upcoming trip to Atlanta, Georgia. Ind. ¶ 11. On or about June 9, 2021, Wright exchanged WhatsApp messages with CC-1 regarding the drugs CC-1 should bring with him, and on or about June 14, 2021, CC-1 informed Wright that he was bringing human growth hormone and EPO for Athlete-2. Ind. ¶ 11. Wright directed CC-1 to meet with Athlete-2 in a hotel to provide him with the requested drugs. Ind. ¶ 11. A week and a half later, on or about June 23, 2021, Wright texted CC-1 and thanked him for "getting my athlete right," referencing Athlete-2 by his first name. Ind. ¶ 11.

The Indictment also asserts the following overt acts in furtherance of Barrett and Wright's conspiracy to violate the FDCA: (i) in January 2021, Barrett texted CC-1 that he needed a "box of epo and 2 axicon to ship to a[n] athlete asap," to which CC-1 responded with dosages and prices, Ind. ¶ 17(a); (ii) in January 2021, Barrett and CC-1 texted about providing "axcion" and "phertamine" to an athlete in preparation for the 100 meter, Ind. ¶ 17(b); (iii) on June 2, 2021, Barrett asked CC-1 for "[p]rices," and CC-1 responded: "100 million stem cells at $1900," "Human Placent is $350," and "Hgh 12 mg $450," Ind. ¶ 17(c); (iv), on June 7, 2021, CC-1 and Athlete-1 discussed CC-1's intent to travel to Texas and Florida to sell misbranded performance-enhancing drugs to Athlete-1 and another athlete, Ind. ¶ 17(d); (v) on June 14, 2021, CC-1 met with Wright and Athlete-2 to provide human growth hormone and EPO to Athlete-2, Ind. ¶ 17(e); (vi) in June 2021, Barrett and CC-1 exchanged texts regarding payment from Athlete-2, with CC-1 later sending Barrett a screenshot reflecting a

payment of $4,590, Ind. ¶ 17(f); and (vii) in March 2022, Barrett texted Athlete-1, "U ass need a drug coach," and "U need a coach that will lie for you," Ind. ¶ 17(g).

Separately from the alleged conspiracies set forth above, the Indictment charges Barrett with submitting fraudulent loan applications on behalf of over seventy individuals through the SBA's PPP. Ind. ¶ 18. The PPP was established during the COVID-19 pandemic to "provide relief to small business . . . by approving government-guaranteed loans issued by commercial lenders." Ind. ¶ 18. The Indictment alleges that "[b]etween in or about 2020 and 2021," Barrett sought over $2.5 million in total loans from the SBA. Ind. ¶ 18. According to the Indictment, in support of the fraudulent loan applications, Barrett "provided a falsified IRS Form 1040 that showed an inaccurate annual income for the relevant Applicant in the prior tax year." Ind. ¶ 21. "Each successful loan application resulted in the issuance of a loan or loans between approximately $20,000 and $29,000, totaling approximately $1.8 million in approved loans." Ind. ¶ 21. "In many cases, Barrett was directly paid by the Applicant for having submitted the fraudulent paperwork, earning approximately $2,000 per loan." Ind. ¶ 21 (further capitalization omitted).

### B.   The Stored Communications Act Warrants

On March 4, 2022, the Honorable Robert W. Lehrburger, U.S. Magistrate Judge for the U.S. District Court for the Southern District of New York, issued multiple search warrants authorizing the Government to search seven WhatsApp accounts (the "WhatsApp Warrant") and multiple email accounts (the "Microsoft Warrant," the "Gmail Warrant," and the "Bluehost Warrant," and, collectively, the "Email Warrants"). Appended to the affidavit supporting the issuance of these warrants (the "March 4, 2022 Affidavit") and incorporated by reference therein is a criminal complaint charging co-conspirator Eric Lira with violations of the RADA and conspiracy to violate the FDCA. March 4, 2022 Affidavit Ex. A, at 024136-

46. The WhatsApp Warrant specifies the accounts to be searched, WhatsApp Warrant at USAO_024149, and authorizes the Government to search those accounts for "any evidence, fruits, and instrumentalities" of 21 U.S.C. §§ 331, 333, 2402, and 2403 — the RADA and FDCA violations — including "[e]vidence of other co-conspirators engaged in the Subject Offenses or evidence sufficient to identify witnesses to the commission of the Subject Offenses," and "[e]vidence of the identities of the account users," WhatsApp Warrant at USAO_024151. The WhatsApp Warrant did not contain any temporal limitation.

As noted above, Magistrate Judge Lehrburger also issued warrants directly to email providers, including the Microsoft Corporation, Google LLC, and Bluehost. Each of these warrants incorporated a temporal limitation. The Microsoft Warrant authorized the search of an email account believed to be associated with Barrett for items "sent, received, or created between July 10 and 24, 2021." Microsoft Warrant at USAO_024154. The Gmail Warrant authorized the search of specific accounts for "items sent, received, or created between January 9 and February 1, 2021," and between "April 4 and 11, 2021." Gmail Warrant at USAO_024164. The Bluehost Warrant likewise authorized law enforcement to search specific accounts for "items sent, received, or created between January 9 and February 1, 2021." Bluehost Warrant at USAO_024169. Each of the email warrants likewise authorized law enforcement to search for "evidence, fruits, and instrumentalities of 21 U.S.C. §§ 331, 333, 2402, and 2403" — the FDCA and RADA violations — and incorporated substantially similar lists of illustrative evidence, including:

- Evidence of other co-conspirators engaged in the Subject Offenses or evidence sufficient to identify witnesses to the commission of the Subject Offenses;
- Evidence of the identities of the account users;
- Evidence of the actual or intended use, distribution, sourcing, transport, development, purchase, sale, and/or transfer of performance-enhancing substances, and any related proceeds;

- Evidence reflecting discussions of the efficacy or testability of drugs;
- Evidence reflecting discussions of competitive sports, including trainings, trials, qualifying events, competitions, or drug testing;
- Evidence reflecting the location of other evidence (*e.g.*, emails reflecting registration of other online accounts potentially containing relevant evidence, or other bank accounts containing the proceeds of crime); and
- Passwords or other information needed to access the online accounts.

Microsoft Warrant at USAO_024155-56; *see also* Gmail Warrant at USAO_024165-66 (same); Bluehost Warrant at USAO_024170-71 (same).  On March 18, 2022, Judge Lehrburger issued another search warrant authorizing the Government to search several iCloud accounts (the "Apple Warrant").  The Apple Warrant specified the accounts to be searched, including two accounts believed to be associated with Barrett.  *See* Apple Warrant at USAO_024174-75.  Like the prior warrants, the Apple Warrant authorized law enforcement to search for "any evidence, fruits, and instrumentalities of 21 U.S.C. §§ 331, 333, 2402, and 2403," and set forth an illustrative list of categories of evidence.  Apple Warrant at USAO_024213.  The Apple Warrant did not incorporate a temporal limitation.

On April 25, 2022, the Honorable Lois Bloom, U.S. Magistrate Judge for the U.S. District Court for the Eastern District of New York, issued a search warrant authorizing the Government to search Barrett's person or residence for two cellular phones associated with Barrett, and to search the seized cellular phones for evidence of violations of the RADA and the FDCA (the "Cellphone Warrant").  Cellphone Warrant at USAO_024086-87.  The search warrant authorized law enforcement to search for "evidence, fruits, and instrumentalities for violations" of the RADA and the FDCA, 21 U.S.C. §§ 331, 333(a), 2402, and 2403, and enumerated categories of evidence substantially similar to those listed in the prior warrants. *See* Cellphone Warrant at USAO_024087-88.  The Cellphone Warrant also contained no temporal limitation.

On June 27, 2022, the Honorable Stewart D. Aaron, U.S. Magistrate Judge for the U.S. District Court for the Southern District of New York, authorized another search warrant permitting law enforcement to search Barrett's cellphones, as well as a Gmail account and Apple iCloud account that had been searched and seized pursuant to the Gmail and Apple Warrants, for evidence of additional crimes (the "Expansion Search Warrant"). Expansion Search Warrant at USAO_024013-34. In a sworn affidavit in support of the Expansion Search Warrant, a Special Agent involved in investigating Barrett asserted that, in the course of reviewing Barrett's cellphones and the electronic data contained therein, law enforcement agents "observed in plain view" evidence of additional offenses. Expansion Search Warrant at USAO_024020. The Special Agent further attested that law enforcement had uncovered messages between Barrett and various individuals discussing Barrett's filing of SBA- or SBA-backed loan applications on their behalf. Expansion Search Warrant at USAO_024021. Law enforcement agents further uncovered messages between Barrett and an individual in federal prison "who was seeking a Georgia State driver's license in his true name," including messages reflecting the incarcerated individual making an online payment to Barrett. Expansion Search Warrant at USAO_024022-23.

The Expansion Search Warrant specifically authorized law enforcement to locate "evidence, fruits, and instrumentalities of violations of Title 18 United States Code, Section 641 (theft of government funds), 1791 (related to providing or possessing contraband in prison), 1343 (wire fraud), and 1344 (bank fraud)," in addition to the FDCA and the RADA violations. Expansion Search Warrant at USAO_024032-33. As before, the warrant set forth specific categories of information that law enforcement personnel was authorized to search:

- Evidence concerning ownership, control, use of, or access to the Subject Devices and the Subject ESI.

- Evidence of communications regarding the Subject Offenses, including messages, posts, images, videos, screen shots, and other images, and other stored content information sending, receiving, discussing, or otherwise regarding Small Business Administration ("SBA") and SBA-backed paycheck protection program loan applications and loans, personally identifiable information of individuals, and bank account or routing information.
- Evidence concerning identities of, and communications with, co-conspirators, or victims involved in the scheme concerning the Subject Offenses.
- The location of other evidence relating to the Subject Offenses (*e.g.*, emails, social media, and/or messages reflecting registration of other online accounts potentially containing relevant evidence).
- Passwords or other information needed to access the users' computer or other online accounts.

Expansion Search Warrant at USAO_024032-33.  The Expansion Search Warrant did not include a temporal limitation.

## II.    Procedural History

On November 29, 2023, the Grand Jury returned a Sealed Indictment charging Barrett and Wright with conspiracy to violate the FDCA with the intent to defraud or mislead, 21 U.S.C. §§ 331, 333(a)(2), *see* Ind. ¶¶ 13-17, and conspiracy to violate the RADA, 21 U.S.C. §§ 2402, 2403, *see* Ind. ¶¶ 1-12.

On November 22, 2024, Barrett filed the instant motion to dismiss, seeking to (i) dismiss Count One of the Indictment; (ii) sever Counts One and Two from Count Three for trial; and (iii) suppress evidence obtained from searches of his cellphone devices and electronic data.  *See generally* Br.  The same day, Wright joined in the motion to dismiss Count One of the Indictment.  Dkt. 48.  On December 13, 2024, the Government filed its opposition, Dkt. 51 ("Opp."), and on December 23, 2024, Barrett filed his reply, Dkt. 54 ("Reply").

## DISCUSSION

**I.    Defendants' Motion to Dismiss Count One of the Indictment**

Defendants move to dismiss Count One of the Indictment on two grounds: first, because the RADA is an unconstitutional delegation of legislative power and unlawfully vague, and second, because — as "athlete[s]" — Defendants are not subject to the RADA's criminal prohibitions.  Br. at 7-13.  The Court addresses these arguments in turn.

### A.    Unconstitutional Delegation of Legislative Power

According to Defendants, Sections 2401 and 2402 of the RADA violate the constitutional nondelegation doctrine because they "permit[] the [United Nations] and a private corporation to define the scope of a federal crime."  Br. at 7.  Specifically, Defendants argue that the RADA's statutory text delegates to nongovernmental entities — the World Anti-Doping Agency (the "WADA"), an international organization, and the United States Anti-Doping Agency (the "USADA"), a private entity — the authority to decide "which substances are criminalized"; "during which sporting events it will be criminal to provide such substances"; and "who is subject to these criminal prohibitions."  *Id.* at 9.

Enacted in 2020, the RADA establishes criminal penalties for participation in schemes designed to influence the outcomes of major international sport competitions, and provides that "[i]t shall be unlawful for any person, other than an athlete, to knowingly carry into effect, attempt to carry into effect, or conspire with any other person to carry into effect a scheme in commerce to influence by use of a prohibited substance or prohibited method any major international sports competition."  21 U.S.C. § 2402(a).  Defendants' nondelegation argument rests on the fact that the RADA defines various of its statutory terms through cross-reference to the World Anti-Doping Code (the "Code") adopted by the WADA, and to Article 2 of the United Nations Educational, Scientific, and Cultural Organization ("UNESCO")

International Convention Against Doping in Sport (the "Convention") "done at Paris October 19, 2005, and ratified by the United States in 2008." 21 U.S.C. § 2401(4). Specifically, the U.S. Code provides that the terms "athlete," "prohibited method," and "prohibited substance" each "has the meaning given the term in Article 2 of the Convention." *Id.* § 2401(2), (7)-(8). The definitions of "prohibited substance" and "prohibited method" in Article 2 of the Convention in turn refer to "any substance or method" so described on the "Prohibited List," which is appended as Annex I to the Convention. *See, e.g.*, *United States v. Lira*, No. 22-cr-00151 (LGS), 2022 WL 17417129, at *3 (S.D.N.Y. Dec. 5, 2022) (citing Convention art. 2, ¶¶ 17-19). The Convention defines an "athlete" as "any person who participates in sport at the international or national level as defined by each national anti-doping organization and accepted by States Parties and any additional person who participates in a sport or event at a lower level accepted by States Parties." Convention art. 2, ¶ 4. When ratifying the Convention, the United States specified "that 'Athlete' for purposes of doping control means any athlete determined by the U.S. Anti-Doping Agency to be subject to or have accepted the World Anti-Doping Code." 154 Cong. Rec. 15517 (2008). Finally, the RADA defines a "Major International Sport Competition" as a competition "that is governed by the anti-doping rules and principles of the Code" promulgated by the WADA. 21 U.S.C. § 2401(5)(ii).

Relying on the RADA's cross-references to the Convention and the WADA Code, Defendants argue that the statute "permit[s] the UN and a private corporation to define the scope of a federal crime," thereby resulting in an abdication by Congress of its core legislative functions. Br. at 7-8. The nondelegation doctrine prevents Congress from "transfer[ring] to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825)); *accord Mistretta v. United States*, 488 U.S. 361, 372

(1989) ("Congress generally cannot delegate its legislative power to another branch").  Courts

recognize, however, that Congress must have "the necessary resources of flexibility and

practicality" to "enable it to perform its functions."  *Gundy*, 139 S. Ct. at 2123 (alterations

adopted) (quoting *Yakus v. United States*, 321 U.S. 414, 425 (1944)).  Congress therefore may

delegate discretion to implement and enforce laws so long as it "lay[s] down by legislative act

an intelligible principle to which the person or body authorized to [exercise the delegated

authority] is directed to conform."  *Mistretta*, 488 U.S. at 372 (second alteration in original)

(quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928)).  "This

'intelligible principle' test requires that 'Congress clearly delineates the policy, the public

agency which is to apply it, and the boundaries of this delegated authority.'"  *United States v.*

*Mingo*, 964 F.3d 134, 137-38 (2d Cir. 2020) (quoting *Am. Power & Light Co. v. SEC*, 329

U.S. 90, 105 (1946)).  Subject to these principles, Congress may also, under certain

circumstances, delegate the authority to issue regulations carrying criminal consequences.

*See, e.g.*, *Loving v. United States*, 517 U.S. 748, 768 (1996) (rejecting nondelegation

challenge to statute authorizing President to define aggravating factors permitting imposition

of the death penalty in military cases and stating "[t]here is no absolute rule, furthermore,

against Congress' delegation of authority to define criminal punishments"); *accord Mistretta*,

488 U.S. at 374-77 (upholding delegation of authority to promulgate sentencing guidelines for

federal criminal offenses to independent sentencing commission).  Limitations on Congress's

ability to delegate are "less stringent in cases where the entity exercising the delegated

authority itself possesses independent authority over the subject matter."  *United States v.*

*Mazurie*, 419 U.S. 544, 556-57 (1975).

   In *United States v. Lira* — the only case to date to address the constitutionality of the

RADA — Judge Schofield identified two possible interpretations of the RADA; under either,

Defendants' arguments fail. *See* 2022 WL 17417129, at *3. In *Lira*, as here, the defendant — Barrett and Wright's co-conspirator in the charged scheme — argued that the "RADA is unconstitutional because its scope can change based on the act of an entity outside the U.S. government." *Id.* at *2. Under the first possible interpretation of the statute, the list of "prohibited substances" and "prohibited methods" cross-referenced in the RADA could be interpreted as fixed at the time the Convention was ratified by the United States in 2008. *See id.* at *3. This reading finds some support in the statutory text itself, which defines the "Convention" as "the United Nations Educational, Scientific, and Cultural Organization International Convention Against Doping in Sport done at Paris October 19, 2005, and ratified by the United States in 2008," 21 U.S.C. § 2401(4), without any reference to subsequent amendments thereto. The RADA's definitions of "athlete" and "major international sports competition" could likewise be interpreted as fixed in time, such that the RADA incorporates the USADA's definition of an "athlete" as of the treaty's ratification and defines "major international sports competition" as those competitions governed by the WADA Code as of its adoption on March 5, 2003. The second way to interpret the RADA is that it incorporates subsequent amendments to those terms as they continue to be updated by the WADA and USADA, or, with respect to the definition of "major international sports competition," as more signatories adopt the WADA Code. *See Lira*, 2022 WL 17417129, at *3. Under the first interpretation — which means that the RADA's terms are static — there is no delegation issue. As *Lira* held, "there is no colorable basis for finding a delegation" because "[t]he effect would be the same as if Congress had copied and pasted the 2008 Prohibited List into the statutory text." *Id.* at *3. In other words, if the RADA's terms are fixed as of the United States's ratification of the Convention in 2008, then the statute merely incorporates by reference terms defined in a treaty already approved by the Senate and ratified by the

President.  That the law presupposes the existence of an independent regulatory body governing international sports, and incorporates and references that body's terminology, does not by itself effect an "abdicat[ion] or . . . transfer[ral]" of Congress's "essential legislative functions." *Pan. Refining Co. v. Ryan*, 293 U.S. 388, 421 (1935).

Defendants' nondelegation challenge, however, necessarily assumes the second interpretation — that is, that the RADA incorporates the WADA's changes to the Convention's terms over time.  So far as Defendants' nondelegation argument rests on the statute's incorporation of the Convention's "Prohibited Substances" list, Defendants' argument fails on standing grounds.  *See* Br. at 8-9.  As in *Lira*, the substances Defendants are accused of using in the alleged conspiracies have been on the prohibited list since the Convention was signed and ratified by the United States in 2008.  *Compare* Ind. ¶¶ 10-12 (referencing human growth hormone, EPO, and Clenbuterol), *with* Convention, annex I, at 3 (listing "Growth Hormone (hGH)," "erythropoietin (EPO)," and "Clenbuterol" as "Prohibited Substances").  Therefore, even "[i]f the statute were given a limiting construction that fixed the Prohibited List at the time of ratification," and even if "any subsequent exercises of delegated authority were not incorporated in the statute," Barrett's and Wright's "alleged conduct would still be covered" by the RADA.  *Lira*, 2022 WL 17417129, at *3 (holding that defendant lacked standing to assert a nondelegation challenge because "the substances Defendant is accused of using in the alleged offenses have been on the prohibited list since the treaty was signed and ratified").  Defendants therefore do not have an "injury in fact" that is "fairly traceable" to the supposed delegation of legislative authority they seek to challenge. *See Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) ("To satisfy Article III's standing requirements, a plaintiff must show (1) that it has suffered an 'injury in fact' . . . ; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it

is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (alterations adopted) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)); *see also United States v. Guzman*, 591 F.3d 83, 92 (2d Cir. 2010) (observing that, on narrow interpretation of statute, defendants already convicted and registered as sex offenders prior to Sex Offender Registration and Notification Act's enactment lacked standing to challenge statute's delegation of authority to Attorney General, because delegated authority would not impact defendants' registration requirements).

Defendants do not contest — or even address — their lack of standing to challenge the RADA on nondelegation grounds.  *See, e.g.*, *Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A.*, 643 F. Supp. 3d 421, 426 (S.D.N.Y. 2002) ("A party may be deemed to concede an argument by failing to address it in an opposition brief." (citing *AT&T Corp. v. Syniverse Tech., Inc.*, No. 12-cv-01812 (NRB), 2014 WL 4412392, at *7 (S.D.N.Y. Sept 8, 2014))). Thus, the Court need not address Defendants' argument that a nondelegation issue is presented by the fact that the WADA "may change the substances on the prohibited list, and in effect, the substances criminalized under 21 U.S.C. § 2402(a) . . . without the approval or consent of the United States Congress."  Br. at 4; *see Price v. Saugerties Cent. Sch. Dist.*, 305 F. App'x 715, 716 (2d Cir. 2009) (summary order) ("Because we conclude . . . that the plaintiffs lack standing, we need not reach the other ground for disposition."); *accord Raum v. Town of Mount Pleasant*, No. 09-cv-05431 (SCR), 2010 WL 11712763, at *1 (S.D.N.Y. Jan. 6, 2010) (declining to reach merits where plaintiff lacked standing).  Defendants do not have standing to raise that issue before this Court.

However, even if Defendants had standing to assert a nondelegation challenge, the RADA does not actually "delegate any legislative authority from Congress to WADA or anyone else."  *Lira*, 2022 WL 17417129, at *3.  Any nondelegation inquiry must begin with

the statute itself.  *See Gundy*, 139 S. Ct. at 2123 ("[A] nondelegation inquiry always begins

(and often almost ends) with statutory interpretation.").  The "constitutional question is

whether the statute" impermissibly "delegate[s] legislative power."  *Whitman v. Am. Trucking*

*Ass'ns*, 531 U.S. 457, 472 (2001).  "[T]he answer requires construing the challenged statute to

figure out what task it delegates and what instructions it provides."  *Gundy*, 139 S. Ct. at

2123.  Here, a review of 21 U.S.C. § 2402's text makes clear that the RADA does not delegate

any authority to the WADA, USADA, or any other entity or body.  Neither the WADA nor

the USADA "requires . . . delegation of authority from Congress to create rules governing

sports competitions, and the RADA does not purport to grant any."  *Lira*, 2022 WL 17417129,

at *4; *cf Mistretta*, 488 U.S. at 371 (finding a permissible delegation of legislative authority

where statute created independent sentencing commission and entrusted commission with

promulgating binding sentencing guidelines).  Instead, the RADA "presupposes the existence

of an independent regulatory regime governing international sports," and "create[s]

freestanding criminal liability for facilitating violations of [that regime's] rules."  *Lira*, 2022

WL 17417129, at *3-4.

      The Supreme Court has only twice struck down statutes for violating the

nondelegation doctrine, both times invalidating provisions far afield from the RADA.  *See*

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Pan. Refining Co.*, 293

U.S. 388.  In *Schechter Poultry*, the Supreme Court considered a provision of the National

Industrial Recovery Act ("NIRA") that empowered self-interested trade and industrial

associations to propose, and the President to approve, "codes of fair competition" across

industries.  295 U.S. at 521-22 (citing 15 U.S.C. § 703).  The NIRA also attached criminal

consequences to violations of those codes, rendering any such violation a federal

misdemeanor.  *See id.* at 523.  The Supreme Court in dictum observed that allowing Congress

to "delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficial" would be "utterly inconsistent with the constitutional prerogatives and duties of Congress." *Id.* at 537. The Court's holding turned, however, on the "virtually unfettered" discretion afforded to the President to approve or prescribe the codes. *See id*. at 537-38 ("The question, then, turns upon the authority which section 3 of the Recovery Act vests in the President to approve or prescribe. If the codes have standing as penal statutes, this must be due to the effect of the executive action."). Finding that the statute "supplie[d] no standards for any trade, industry, or activity," nor "rules of conduct to be applied to particular states of fact," the Court held that it amounted to "an unconstitutional delegation of legislative power." *Id.* at 541-52.

In *Panama Refining*, the Supreme Court struck down a provision of the NIRA that authorized the President to prohibit the transportation in interstate and foreign commerce of petroleum produced or withdrawn from storage in excess of state law limits. *See* 293 U.S. at 405-06, 433. The Supreme Court found that this "delegation of legislative power" was distinct from instances where, for instance, Congress authorized "selected instrumentalities" to "ascertai[n] the existence of facts to which legislation is directed"; "to fill up the details under general provisions made by the Legislature"; or to "ascertai[n] what particular cases came within" a general rule promulgated by Congress — all lawful delegations of authority elsewhere upheld by the Court. *Id.* at 426-27 (citations and quotation marks omitted). In contrast, the Court held that the NIRA provision at issue "declared no policy, . . . established no standard, [and] laid down no rule" for the President to apply when acting thereunder. *Id.* at 430. Since the statute was devoid of any "definition of circumstances and conditions in which transportation was to be allowed or prohibited," there was no "intelligible principle" limiting

the President's discretion, rendering the statute an unlawful delegation of Congress's lawmaking authority.  *See id.*

Unlike the statutes in *Schechter Poultry* and *Panama Refining*, the RADA does not give any power to either the WADA or the USADA, and the Court therefore need not determine whether the statute provides an "intelligible principle" to constrain the exercise of the WADA's or the USADA's discretion.  Both *Schechter Poultry* and *Panama Refining* involved statutes that expressly authorized the executive branch to enact law.  *See Schechter Poultry*, 295 U.S. at 521 (section 3 of the NIRA authorized the President to approve "codes of fair competition"); *Pan. Refining Co.*, 293 U.S. 388 at 406 (under section 9(c) of the NIRA, "[t]he President [was] authorized to prohibit the transportation in interstate and foreign commerce of petroleum" (quoting 15 U.S.C. § 709(c)).  The President subsequently acted pursuant to Congress's delegated authority: in *Panama Refining*, the President issued an executive order to establish a code of fair competition for the petroleum industry, 293 U.S. at 406-09, and in *Schechter Poultry*, the President adopted the Live Poultry Code, making violation of its regulations a federal offense, *see* 295 U.S. at 521-23.  In each instance, the President derived his authority to enact the laws at issue directly from a delegation in a congressional statute.  Underlying both cases were separation-of-powers concerns presented by the delegation of legislative authority to a coordinate branch of government, necessitating an analysis of whether the congressional statutes set forth a sufficient "intelligible principle to which the [delegee] [was] directed to conform."  *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton*, 276 U.S. at 409).  But the RADA does not vest any authority in either the USADA or the WADA.  When the WADA proposes amendments to the Convention's Prohibited Substances list, it does not do so pursuant to any authority from Congress.  *See Lira*, 2022 WL 17417129, at *3 (describing process governing amendments to the Prohibited Substances

List).  Likewise, the USADA does not act pursuant to any authority derived from the RADA when it determines which athletes should be subject to or have adopted the WADA Code.  *See id.*  The nondelegation doctrine is therefore inapplicable here.  Defendants cite no authority that supports extending the nondelegation doctrine — last applied by the Supreme Court to invalidate a statute in 1935 — to the present circumstances.  The Court therefore declines to extend the doctrine to invalidate a statute that does not delegate any power to bodies located outside of the legislature, but instead incorporates by reference the terms and definitions of an independent anti-doping regime.

Moreover, it is significant that, even under an interpretation of the RADA whereby the statute incorporates amendments to the Convention's terms, the WADA's proposed amendments are not automatically incorporated into the Convention, and therefore are not automatically incorporated into the RADA.  The Convention provides state parties with an opportunity to object to any amendments to the "Prohibited Substances" list.  Under the Convention, state parties "have 45 days from the Director-General's notification [of an amendment to the Prohibited Lists] within which to express their objection to the proposed amendment either in writing, in case of written consultation, to the Director-General or at a session of the Conference of Parties."  Convention art. 34, ¶ 2.  State parties that "do[] not accept an amendment . . . remain[] bound by the Annexes as not amended."  *Id.* ¶ 4. Therefore, "while the Treaty, as ratified by Congress, expressly recognizes procedures for revising Annex I of the International Convention Against Doping in Sport, such amendments are not instantly binding: the Treaty also provides a mechanism by which those amendments may be rejected, or accepted in the absence of an objection."  Opp. at 11 n.6.  Since the WADA's proposed changes to the "Prohibited Substances" list do not take immediate legal

effect, the WADA does not in fact have unilateral authority, as Defendants suggest, "to determine and change the scope of a federal criminal law."  Br. at 8.

Even where private entities have been incorporated into regulatory processes, the Supreme Court has declined to find any nondelegation issue when government actors have retained ultimate decision-making authority.  For instance, in *Sunshine Anthracite Coal Co. v. Adkins*, the Supreme Court held that the Bituminous Coal Act of 1937 did not unconstitutionally delegate legislative power to industry members where minimum price codes proposed by coal producers were subject to "approv[al], disapprov[al], or modifi[cation]" by a federal agency before taking legal effect.  310 U.S. 381, 387-88, 399 (1940); *cf. Carter v. Carter Coal Co.*, 298 U.S. 238, 283-84, 311 (1936) (invalidating earlier version of same statute that provided for the enactment of minimum wage and labor codes without approval by any federal official).  And in *Currin v. Wallace*, the Supreme Court upheld the Tobacco Inspection Act (TIA) of 1935, which required tobacco growers to approve any designation by the Secretary of Agriculture of markets in which tobacco could not be sold absent inspection and certification by an authorized representative of the Secretary.  306 U.S. 1, 6, 18 (1939).  The Supreme Court found that the TIA did not "involve any delegation of legislative authority" to tobacco growers because growers did not have authority to "make the law" and enforce it upon others.  *Id.* at 15-16.  Here, as in *Currin* and *Adkins*, WADA's amendments do not take effect for purposes of the RADA absent assent (tacit or explicit) by the United States government.  The WADA and the USADA therefore do not have authority to make the law.

Notably, the RADA's structure is also not unprecedented.  The Chemical Weapons Convention Implementation Act (CWCIA) of 1998 makes it unlawful to, among other things, "retain, own, possess, or use, or threaten to use," any "chemical weapon," defined thereunder

as a "toxic chemical and its precursors." *See* 18 U.S.C. §§ 229(a)(1), 229F(1)(A).  The CWCIA defines a "toxic chemical" as any chemical which can "cause death, temporary incapacitation or permanent harm to humans or animals," 18 U.S.C. § 299F(8)(A) and "precursors" as "any chemical reactant" involved in the "production . . . of a toxic chemical," *id.* § 229F(6)(A).  Like the RADA, the CWCIA incorporates by reference the list of precursors and toxic chemicals contained in the annexes of a UN treaty, the Chemical Weapons Convention.  *Id.* §§ 229F(6)(B), (8)(B).  The parties do not cite, nor is the Court aware of, any nondelegation challenge to the CWCIA's incorporation of the terms of an international treaty.  Defendants' efforts to distinguish the CWCIA are unpersuasive. Defendants argue that because the CWCIA "includes its own specific definition" of the term "chemical weapon[s]," it "would not pose the same delegation problem presented in RADA." Br. at 11.  But the CWCIA's incorporation of the Chemical Weapons Convention's list of toxic chemicals and precursors as substances covered thereunder means that, like the RADA, "someone's use of a particular substance might be lawful or arguably lawful one day and plainly unlawful the next based on an amendment to a treaty's annex."  *Lira*, 2022 WL 17417129, at *3 (rejecting similar argument).

It is likewise not uncommon for federal criminal statutes to incorporate the laws of other bodies, including any amendments thereto.  For example, the Assimilated Crimes Act makes it a federal offense to violate state criminal law on federal land based on the state law "in force at the time" of the defendant's conduct.  18 U.S.C. § 13(a).  The Assimilated Crimes Act therefore defines the scope of federal criminal liability based on substantive state law — including amendments promulgated thereunder after the enactment of that Act — making it vulnerable to the same challenge Defendants level against the RADA.  But the Supreme Court has held that the Assimilated Crimes Act is not a "delegation by Congress of its legislative

authority to the States." *United States v. Sharpnack*, 355 U.S. 286, 294 (1958). The Court

found that the statute was instead a "deliberate continuing adoption by Congress . . . of such

. . . offenses and punishments as shall have been already put in effect by the respective States

for their own government." *Id.* Similarly here, the RADA is a "deliberate adopting by

Congress," *id.* of Prohibited Substances already banned by the UN and state parties —

including the United States — under the International Convention Against Doping in Sport.

Just as Congress retains power to "exclude a particular state law from the assimilative effect

of the [Assimilated Crimes] Act," *id.*, Congress may exclude any subsequent amendments to

the Treaty's Prohibited Substances list from the assimilative effect of the RADA. The

*Sharpnack* Court also underscored that it made sense for Congress to seek to make "the

federal regulation of local conduct conform to that already established by the State." *Id.*

Likewise here, it is appropriate for Congress to seek to synchronize domestic efforts to

prevent anti-doping with the international anti-doping framework already in existence.

The Lacey Act of 1900 provides another example of a federal criminal statute that

dynamically incorporates the law of states and foreign bodies. The Lacey Act makes it a

federal crime to "import, export, transport, sell, receive, or purchase in interstate or foreign

commerce . . . any fish or wildlife taken, possessed, transported, or sold *in violation of any

law or regulation of any State or in violation of any foreign law*." 16 U.S.C. § 3372(a)(2)(A)

(emphasis added). Courts have repeatedly upheld the Lacey Act against nondelegation

challenges based on the statute's incorporation of foreign and state laws. *See, e.g.*, *United

States v. Molt*, 599 F.2d 1217, 1219 n.1 (3rd Cir. 1979) (explaining that the "[Lacey] Act does

not delegate legislative power to foreign governments, but simply limits the exclusion from

the stream of foreign commerce to wildlife unlawfully taken abroad"); *United States v.

Bryant*, 716 F.2d 1091, 1094-95 (6th Cir. 1983) (adopting *Molt's* reasoning to find no

unlawful delegation to states); *United States v. Rioseco*, 845 F.2d 299, 301-02 (11th Cir. 1988) (holding that the Lacey Act "grants no power to foreign governments" because "Congress, itself, has set out the penalties for violation of [the] Lacey Act"). As the Ninth Circuit explained in *United States v. Lee*, the Lacey Act does "not appl[y] the foreign law *per se*, but rather it [looks] to the foreign law to determine if the Act's provisions are triggered; if so, then it will apply the Act, and not the foreign law." 937 F.2d 1388, 1393 (1991) (quoting *United States v. 594,464 Pounds of Salmon*, 871 F.2d 824, 830 (9th Cir. 1989)). Whether wildlife is taken "in violation of" foreign or state law is therefore merely a factual predicate for the application of federal law. In the same respect, the RADA's definition of a "major international sports competition" as a competition "governed by the anti-doping rules and principles of [WADA's] Code," 21 U.S.C. § 2401(5)(a)(ii), does not delegate any power to the WADA, but "simply limits" the RADA's application to those competitions subject to WADA's jurisdiction, *Molt*, 599 F.2d at 1219 n.1. Whether a competition is governed by the WADA Code is in turn a straightforward and verifiable fact informed by whether a competition's host is a signatory to the Code. Akin to the Lacey Act, the condition that international competitions be governed by the Code is merely a prerequisite for enforcing the RADA and the penalties that Congress has set forth therein.

The Racketeer Influenced and Corrupt Organizations Act's ("RICO") scope likewise turns on state law and amendments thereunder. The RICO statute criminalizes racketeering activity, defined in part as conduct "chargeable under State law." 18 U.S.C. § 1961(1)(A). To this Court's knowledge, no court has deemed this incorporation of state law criminal statutes into the federal RICO statute an impermissible delegation of legislative power, "even though that incorporation inherently contemplates amendments to those laws made by state — not federal — legislatures," Opp. at 51. Defendants' efforts to distinguish the RICO statute

are unpersuasive.  It is true that the Second Circuit has construed the RICO statute as incorporating only "generic definitions of murder, arson, and extortion," and not the "elements of the penal codes of the various states where acts of racketeering occurred." *United States v. Bagaric*, 706 F.2d 42, 62-63 (2d Cir. 1983), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994).  The RICO statute is therefore "not meant to incorporate state procedural and evidentiary law; rather, referenc[e] to state law in [the RICO statute] merely serve[s] a definitional purpose, that is, to identify generally the kind of conduct made illegal by the federal law."  *United States v. Dias*, 176 F.3d 52, 100 (2d Cir. 1999); *accord United States v. Miller*, 116 F.3d 641, 675 (2d Cir. 1997).  That does not, however, meaningfully distinguish the RICO statute's reliance on state law from the RADA's incorporation of the Convention's terms: amendments to the law in the state where the racketeering activity took place (for instance, to decriminalize certain conduct) could still impact liability under the RICO statute.  The federal RICO statute is therefore akin to the RADA insofar as it incorporates by reference an evolving body of law promulgated by an entity outside the federal legislature, and yet the statute has never been challenged on nondelegation grounds.

To summarize, the RADA's incorporation of the terms and standards of external entities is both readily distinguishable from those laws the Supreme Court has invalidated as unlawful delegations of legislative authority, and not unprecedented among federal criminal statutes.  For these reasons, this Court adopts *Lira*'s reasoning and declines to find that the RADA violates the nondelegation doctrine.  Defendants' efforts to distinguish *Lira* because Judge Schofield did not explicitly address the statute's definitions of an "athlete" or an

"international sporting event" are unpersuasive.  Br. at 11.[2]  *Lira*'s analysis applies with equal force to those terms.  It is true that the RADA refers to the Convention's definition of an "athlete," 21 U.S.C. § 2401(2), and that the United States when ratifying the Convention further defined "athlete" as "any athlete determined by the [USADA] to be subject to or have accepted the World Anti-Doping Code."  154 Cong. Rec. 15517.  But when the USADA decides who is and who is not an "athlete" for anti-doping purposes, it does not do so pursuant to any authority derived from the RADA.  In this respect, the RADA is akin to 18 U.S.C. § 992(g), which defines the scope of the felon-in-possession laws based upon various status determinations by external bodies, including, for instance, whether someone has been "convicted in any court of, a crime punishable by imprisonment for a term exceeding one year," *id.* § 922(g)(1); "adjudicated as a mental defective or . . . has been committed to a mental institution" *id.* § 922(g)(4); or "discharged from the Armed Forces under dishonorable conditions," *id.* § 922(g)(6).[3]  As for the statute's definition of a "major international sports competition," for the reasons set forth above, limiting the RADA's reach to those competitions "governed by the anti-doping rules and principles" of the WADA Code does not delegate any authority to the WADA.

---

[2] The statute does not include the term "international sporting event."  The Court assumes the Defendants are referring to the defined term "major international sports competition."

[3] Defendants seek to distinguish 18 U.S.C. § 922(g) by arguing that its various provisions "premise criminal liability for gun possession on straightforward, defined, verifiable historical facts, which are specified in the statutory text."  Reply at 6.  But whether an individual is "subject to or ha[s] accepted the World Anti-Doping Code" is likewise "straightforward" and "verifiable."

For the foregoing reasons, the Court rejects Defendants' nondelegation challenge to the RADA. [4]

### B.   Void for Vagueness

Defendants separately argue that the "RADA is unconstitutionally vague."  Br. at 9. According to Defendants, because the RADA incorporates "several imprecise, vague, and overly expansive terms," it "fails to provide fair notice of the conduct that is prohibited and encourages arbitrary and discriminatory enforcement by officials."  *Id.* at 9-10.  The Court is not so persuaded.

"The void-for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (citation omitted); *accord Skilling v. United States*, 561 U.S. 358, 402-03 (2010).  Vagueness challenges can be asserted either as as-applied challenges or facial challenges.  *United States v. Requena*, 980

---

[4] Defendants' argument is more aptly construed as a challenge rooted in due process and the void-for-vagueness doctrine than in the nondelegation doctrine, although Justice Gorsuch has suggested that "most any challenge to a legislative delegation can be reframed as a vagueness complaint," *Gundy*, 588 U.S. at 168 (Gorsuch, J., dissenting).  Defendants' nondelegation argument ultimately boils down to a charge that the RADA is insufficiently precise about who is subject to its criminal prohibitions and the conduct it covers, including because several of its terms are subject to amendment by external bodies.  Indeed, Defendants themselves elsewhere characterize their "nondelegation" concerns as a vagueness claim.  *See, e.g.*, Reply Br. at 7-8 (arguing that the term "athlete" is "unconstitutionally vague" because "[t]he statute itself does not define this term, instead delegating definition of the term to the Anti-Doping Convention," and that it is "thus unclear who qualifies as an 'athlete' and who is subject to RADA's criminal prohibitions").  The Supreme Court has recognized that the void-for-vagueness and nondelegation doctrines are related.  *See, e.g.*, *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality opinion) (observing that the void-for-vagueness doctrine is in some respects a "corollary of the separation of powers — requiring that Congress . . . define what conduct is sanctionable and what is not.").  However, to the extent Defendants challenge the RADA on vagueness grounds, that challenge separately fails for the reasons set forth *infra*, *see* I.B.

F.3d 30, 39 (2d Cir. 2020).  The former asserts that the "law in question 'cannot constitutionally be applied to the challenger's individual circumstances.'"  *Requena*, 980 F.3d at 39 (quoting *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018)).  To address an as-applied vagueness challenge, courts undertake a two-step analysis: the court must (1) "determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and (2) "then consider whether the law provides explicit standards for those who apply it."  *Farrell v. Burke*, 449 F.3d 470, 486 (2d Cir. 2008) (quoting *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993)).  The doctrine seeks to provide "fair notice" while preventing "arbitrary and discriminatory prosecutions."  *Skilling*, 561 U.S. at 412; *accord United States v. Avenatti*, 432 F. Supp. 3d 354, 366 (S.D.N.Y. 2020).

"[A] party may also challenge a statute as vague *on its face*, asserting that it is 'so fatally indefinite that it cannot constitutionally be applied to anyone.'"  *Requena*, 980 F.3d at 39 (quoting *Copeland*, 893 F.3d at 110).  A facial challenge to a legislative act faces a "heavy burden," *Sanitation & Recycling Indus. Inc. v. City of New York*, 107 F.3d 985, 992 (2d Cir. 1997) (citing *Younger v. Harris*, 401 U.S. 37, 52-53 (1971)): "[T]he challenger must establish that no set of circumstances exists under which the Act would be valid."  *Copeland*, 893 F.3d at 121 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *accord Lira*, 2022 WL 17417129, at *4 (quoting *Requena*, 980 F.3d at 39).  "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."  *Village of Hoffman Estates v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 495 (1982).

To the extent Defendants assert an as-applied challenge to the RADA, any such challenge necessarily fails.  Defendants' charged conduct — a conspiracy to distribute performance-enhancing drugs expressly listed in the Convention's "Prohibited List" to

Olympian athletes in advance of the 2020 Tokyo Olympics — clearly falls within the scope of the statute. *Compare* Ind. ¶¶ 10-12 (referencing human growth hormone, EPO, and Clenbuterol) *with* Convention, annex I, at 3 (listing "Growth Hormone (hGH)," "erythropoietin (EPO)," and "Clenbuterol" as "Prohibited Substances"). Those terms that Defendants contend are impermissibly vague — to "influence" and "prohibited substance," Br. at 10 — are not ambiguous as applied to the conduct charged in the Indictment. *Lira* acknowledged as much when analyzing substantially similar charges: Judge Schofield recognized that an as-applied challenge would be futile because "Defendant's charged conduct — conspiring to provide prohibited performance enhancing drugs to Olympic athletes — is easily understood to violate the statute." 2022 WL 17417129, at *4. So too here.

Whether Defendants can mount a facial challenge against a statute that can be constitutionally applied to their own conduct presents, however, a more complicated question. To date, the Supreme Court has recognized just three exceptions to the general principle that a facial challenge will succeed "only if the enactment is impermissibly vague in all of its applications," *Hoffman Estates*, 455 U.S. at 495, as summarized by the Second Circuit in *Requena*, *see* 980 F.3d at 39-43. None apply here. First, there is a limited exception for facial challenges to statutes that "implicat[e] rights protected by the First Amendment, even if the statute is not vague as applied to that challenger's conduct." *Requena*, 980 F.3d at 39 (citing *Parker v. Levy*, 417 U.S. 733, 759 (1974)). Second, a "plurality of the Supreme Court has also suggested that 'a criminal law lacking a *mens rea* requirement and burdening a constitutional right is subject to facial attack when vagueness permeates the text of such a law,' even if that law does not impinge on rights guaranteed by the First Amendment specifically." *Id.* (alteration adopted) (quotation marks omitted) (quoting *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015)); *accord United States v. Rybicki*,

354 F.3d 124, 131 (2d Cir. 2003) (citing *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999)).

Finally, the Supreme Court has held that criminal statutes requiring the categorical approach

may be void for vagueness even though "some conduct . . . clearly falls within the provision's

grasp." *Requena*, 980 F.3d at 40 (omission in original) (first quoting *Johnson v. United

States*, 576 U.S. 591, 602 (2015); and then quoting *Sessions v. Dimaya*, 138 S. Ct. 1204, 1214

n.3 (2018)); *see also id.* at 1211 (explaining that the categorical approach "requires a court to

ask whether the 'ordinary case' of an offense poses the requisite risk"). However, "[n]either

the Supreme Court nor [the Second Circuit] has definitively resolved whether facial

vagueness challenges not based on the First Amendment may proceed against statutes that can

constitutionally be applied to the challenger's *own* conduct." *Id.* at 40 (citing *Copeland*, 893

F.3d at 111); *see also Farrell*, 449 F.3d at 495 n.12 ("It is also not clear whether the

'impermissibly vague in all its applications' standard, if indeed it is the governing standard,

applies where fundamental rights other than First Amendment rights are implicated.");

*Dickerson v. Napolitano*, 604 F.3d 732, 743 (2d Cir. 2010) ("Whether a facial void-for-

vagueness challenge can be maintained when, as here, a challenge is *not* properly based on the

First Amendment is unsettled." (first citing *Farrell*, 449 F.3d at 495 n.12; and then citing

*Rybicki*, 354 F.3d at 131-32)).

     The Second Circuit regularly declines to consider facial challenges when the law is not

unconstitutional in all its applications and does not otherwise fall within one of the above-

enumerated exceptions. *See, e.g., Copeland*, 893 F.3d at 111 ("If a court concludes that a

statute was constitutionally applied to a facial challenger, then it generally need not consider

the statute's applicability in other situations." (citing *Diaz v. Paterson*, 547 F.3d 88, 101 (2d

Cir. 2008))); *Requena*, 980 F.3d at 40-41 (rejecting facial challenge to the Controlled

Substance Analogue Enforcement Act of 1986's definition of a controlled substance analogue

given prior precedents upholding the Act against as-applied challenges); *Nadi*, 996 F.2d at 550 ("[V]agueness challenges that do not involve the First Amendment must be examined in light of the specific facts of the case at hand and not with regard to the statute's facial validity").  Indeed, the Second Circuit "typically evaluate[s] 'vagueness challenges to statutes not threatening First Amendment interests . . . in light of the facts of the case at hand,' *i.e.*, only 'on an as-applied basis.'"  *Requena*, 980 F.3d at 40 (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)) (citing *United States v. Holcombe*, 883 F.3d 12, 17 (2d Cir. 2018)); *see Holcombe*, 883 F.3d at 17 ("Where . . . First Amendment rights are not implicated, we evaluate such a challenge . . . [without] regard to the facial validity of the criminal statute or regulation at issue." (citing *Nadi*, 996 F.2d at 550)); *Ljutica v. Holder*, 588 F.3d 119, 125 (2d Cir. 2009) ("Outside the First Amendment context, we assess statutes for vagueness only as applied." (citing *Rybicki*, 354 F.3d at 129-30)); *United States v. Rybicki*, 287 F.3d 257, 263 (2d Cir. 2002) ("Where there is a vagueness challenge to a statute that does not involve First Amendment freedoms, the statute must be evaluated on an 'as applied' basis." (citing *United States v. Whittaker*, 999 F.2d 38, 42 (2d Cir. 1993))); *United States v. Holloway*, No. 20-578, 2022 WL 453370, at *2 (2d Cir. Feb. 15, 2022) (summary order) (similar); *see also United States v. Reese*, No. 24-cr-00062 (VB), 2024 WL 3913152, at *2-3 (S.D.N.Y. Aug. 23, 2024) (holding that defendant "[could not] bring a facial challenge" where "none of the three circumstances in which courts consider facial vagueness challenges exist[ed]").  Accordingly, Defendants cannot bring a facial challenge against the RADA.

Defendants cite to *Davis v. United States*, 139 S. Ct. 2319 (2019), and *Johnson* to argue that here, as in those cases, "the indeterminacy and breadth" of the RADA's language "render[s] it improperly vague, even though there [are] also cases that would obviously be covered by" the statute.  Br. at 12.  *Davis* and *Johnson*, however, are inapplicable to the

RADA.  In those cases, the Supreme Court struck down as facially invalid criminal statutes
that required courts to apply a categorical approach: in *Davis*, 18 U.S.C. § 924(c)'s residual
clause defining a "crime of violence," *see* 588 U.S. at 448, and in *Johnson*, 18 U.S.C. §
924(e)'s residual clause defining a "violent felony," 576 U.S. at 593.  The Supreme Court
observed that, under a categorical approach, "judges had to disregard how the defendant
actually committed his crime," and instead "imagine the idealized 'ordinary case' of the
defendant's crime."  *Davis*, 139 S. Ct. at 2326 (quoting *Johnson*, 576 U.S. at 597).  This
approach, the Supreme Court held, effectively imposed criminal punishment based on a
"judge's estimation of the degree of risk posed by a crime's imagined 'ordinary case,'" *id.*,
thereby introducing a degree of "unpredictability and arbitrariness" that rendered those
statutes facially invalid, *Johnson*, 576 U.S. at 598.  The RADA does not implicate the same
concerns.  To the contrary, the "RADA requires application of a qualitative standard
('influence') to a defendant's real-world conduct."  *Lira*, 2022 WL 17417129, at *5.  "Neither
the Supreme Court nor [the Second Circuit] has ever extended the reasoning in *Johnson* and
its progeny to invalidate a statute that does not require application of the categorical
approach," and, to the contrary, "[the Second Circuit] has expressly cabined the *Johnson*
reasoning to statutes that do."  *Requena*, 980 F.3d at 42; *see id.* at 41 (observing that
"'exceptional circumstances' . . . justified *Johnson*'s extraordinary facial invalidation"
(quoting *Copeland*, 893 F.3d at 111 n.2)); *see Copeland*, 893 F.3d at 111 n.2 (citing *Johnson*
and *Dimaya* for the proposition that, "in certain exceptional circumstances . . . a criminal
statute may be struck down as facially vague even where it has some valid applications").  For
that reason, even post-*Johnson*, the Second Circuit has maintained that "[i]n the ordinary
case," a party asserting a facial vagueness challenge "must establish that *no* set of

circumstances exist under which the Act would be valid." *Requena*, 980 F.3d at 39 (emphasis added) (quoting *Copeland*, 893 F.3d at 110).

Therefore, for the aforementioned reasons, the Defendants' vagueness challenge is rejected.

### C.   Defendants Are "Athletes"

Defendants separately contend that, even if the Court finds the RADA constitutional, the law's criminal penalties cannot be applied to them because they are "athlete[s]" within the meaning of the RADA's statutory exemption.  Br. at 12-13; Reply at 11-12.  As explained below, the Court finds no deficiency in the Indictment as charged that would warrant striking Count One in its entirety.  To the extent there is a fact issue as to whether Defendants constitute "athletes" within the meaning of the RADA's statutory exemption, that is an issue best resolved by the factfinder at trial.

A defendant may move to dismiss an indictment on the grounds that it "lack[s] . . . specificity" or "fail[s] to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(iii), (v).  "For each count, the indictment . . . must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."  Fed. R. Crim. P. 7(c)(1).  "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events."  *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992)).  "An indictment that does not set out all of the essential elements of the offense charged is defective," and citing to the statute the defendant has allegedly violated is not enough.  *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012); *see id.* at 128.  However, an indictment "need do little more than to track the language of the

statute charged and state the time and place (in approximate terms) of the alleged crime."
*United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Stavroulakis*, 952 F.2d at
693); *accord* Fed. R. Crim. P. 7(c)(1) ("The indictment . . . must be a plain, concise, and
definite written statement of the essential facts constituting the offense charged . . . .").  "The
dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited
circumstances implicating fundamental rights."  *United States v. De La Pava*, 268 F.3d 157,
165 (2d Cir. 2001) (quoting *United States v. Nai Fook Li*, 206 F.3d 56, 62 (1st Cir. 2000)).

　　　　The Indictment sets forth the charges against Defendants with sufficient particularity.
"[A]t the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the
elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021)
(quoting *United States v. Wedd*, 993 F.3d 104, 121 (2d Cir. 2021)).  Here, the Indictment
"contains the elements of the offense charged" and "fairly informs" Defendants "of the
charge[s] against which [they] must defend," as well as "enables [them] to plead an acquittal
or conviction in bar of future prosecutions for the same offense."  *United States v. Stringer*,
730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117
(1974)).  The Government here has done more than just "track the statutory language" — it
has pleaded facts in support of the statutory elements, including facts to support a showing
that Barrett and Wright were not "athletes" at the time of the underlying conspiracies.  While
the Indictment does not explicitly allege that Defendants are not athletes, it states that, "[a]t all
relevant times," Barrett "was a track and field coach and personal trainer based in the New
York City area," and Wright "was a track and field coach based in Atlanta, Georgia."  Ind. ¶
9.  To the extent there is a dispute as to whether Barrett or Wright were athletes within the
meaning of the RADA during the relevant time period, that is a fact-specific issue best
reserved for trial.  *See Alfonso*, 143 F.3d at 777 (where "[t]he requirement of an effect on

interstate commerce is itself an element of the offense charged . . . the determination of whether the jurisdictional element has been satisfied is part and parcel of the inquiry into . . . whether the statute has been violated," and sufficiency of the evidence satisfying that element "is not appropriately decided on a motion to dismiss.")  At this stage, the Indictment is sufficient to allege that Defendants fall within the RADA's reach.

Defendants' cited authorities are unavailing.  *United States v. Berlin* concerned an indictment's failure to adequately allege the knowledge requirement of a federal statute.  472 F.2d 1002, 1007 (2d Cir. 1973).  Even with respect to pleading knowledge and intent, *Berlin* noted that "there is no requirement that the offense be charged in the language of the statute, so long as the defendant is apprised of the offense with which he is charged." *Id.* at 1007 (citing *United States v. Di Pietroantonio*, 289 F.2d 122, 124 (2d Cir. 1961)).  As for *United States v. Biba*, the Government there failed to include "*any* allegation that Defendant 'brandished' a firearm," as necessary to establish a violation of 18 U.S.C. § 924(c)(1)(A)(ii). 395 F. Supp. 3d 227, 237 (E.D.N.Y. 2019) (emphasis added).  Here, the Government has not failed to allege any of the elements necessary to satisfy the RADA.  At most, the Government has not explicitly stated that the Defendants "are *not* athletes," but it need not do so where other facts alleged in the Indictment establish the same.

For the foregoing reasons, the Court denies Defendants' motion to dismiss Count One of the Indictment.

## II.    Barrett's Motion to Sever Counts for Trial

Barrett separately argues that Count Three is not properly joined with Counts One and Two under Federal Rule of Criminal Procedure ("Rule") 8(a), and that even if it is properly joined, the Court should nevertheless exercise its discretion under Rule 14(a) to sever Count Three for purposes of trial.  Br. at 13.

Rule 8(a) provides that separate offenses against a defendant may only be joined in a single indictment if they are: (i) "of the same or similar character"; (ii) "based on the same act or transaction"; or (iii) "connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).  "'Joinder is proper where the same evidence may be used to prove each count,' or if the counts have a 'sufficient logical connection.'"  *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (citations omitted) (first quoting *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991); and then quoting *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990)).  "The appropriate remedy for misjoinder is severance."  *United States v. Forde*, 699 F. Supp. 2d 637, 640 (S.D.N.Y. 2010) (citing *United States v. Carrozza*, 728 F. Supp. 266, 271 (S.D.N.Y. 1990), *aff'd*, 956 F.2d 1160 (2d Cir. 1992) (unpublished table decision)).

The Government does not contend (nor could they) that Count Three is "based on the same act or transaction" as Counts One and Two, or that the counts are "connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  The only basis for joinder, then, is if the counts can be construed as exhibiting a "same or similar character."  *Id.* But to argue that the alleged conspiracy to distribute misbranded and performance-enhancing drugs to athletes is of the "same or similar character" as an entirely separate conspiracy to fraudulently obtain COVID-19 loans from the SBA strains credulity.  In arguing otherwise, the Government vaguely asserts that all three counts "predominantly occurred in 2021" and involve "evidence of Barrett's employment and financial state in 2020 and 2021, when Barrett committed the charged offenses, and when he was economically motivated to commit these crimes."  Opp. at 30.  Taken to its logical conclusion, the Government's argument would effectively permit joinder of any criminal offenses committed in or around the same time, so long as the crimes can be said to have been "economically motivated."  That is too sparse a justification to satisfy even the liberal joinder standard: there are many federal crimes that

may share "economic motivations," but little else.  *See United States v. Bezmalinovic*, No. 96-cr-00097 (MGC), 1996 WL 737037, at *5 (S.D.N.Y Dec. 26, 1996) ("The government's broad argument that in all the offenses charged, [defendant] used fraud to achieve his goal of obtaining money, is true of a great number of crimes, not all of which are of a 'similar character' to each other within the meaning of Rule 8(a).").  That two crimes may be economic in nature is not sufficient to justify joinder.  *Cf. United States v. Litwok*, 678 F.3d 208, 271 (2d Cir. 2012) (reversing trial court's joinder of mail fraud and tax evasion charges where "there was no link, let a alone a direct one" between the charges); *United States v. Shellef*, 507 F.3d 82, 87-88 (2d Cir. 2007) (joinder of wire fraud and tax evasion claims reversible error); *United States v. Halper*, 590 F.2d 422, 428 (2d Cir. 1978) (joinder of Medicaid fraud indictment and income tax evasion indictment reversible error).  As for the judicial economy considerations the Government cites, including "the need to empanel multiple juries, conduct multiple rounds of pre-trial briefing, and present evidence from overlapping witnesses," Opp. at 30, those considerations apply in nearly every case and therefore do not suffice to defeat severance where joinder is otherwise inappropriate.

Even if joinder were appropriate under Rule 8 (and it is not), the Court nevertheless finds that severance would be appropriate under Rule 14(a).  "Even if offenses are properly joined, in certain circumstances severance may be warranted."  *Page*, 657 F.3d at 129.  Under Rule 14(a), "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts . . . or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  Thus, a court may order severance when there is a risk of the jury "us[ing] the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant," or "cumulat[ing] the evidence of the various crimes charged and find[ing] guilt when, if considered separately, it

would not so find." *Halper*, 590 F.2d at 431 (quoting *Drew v. United States*, 331 F.2d 85, 88 (D.C. Cir. 1964)). Rule 14 "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 539 (2d Cir. 2011). "A discretionary severance should be granted 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Parnas*, No. 19-cr-00725 (JPO), 2021 WL 2981567, at *2 (S.D.N.Y. July 14, 2021) (quoting *Zafiro*, 506 U.S. at 539).

Here, joining Counts One and Two with Count Three creates the possibility of jurors drawing propensity-based inferences against Barrett and inferring guilt where they may otherwise not find it. In other words, a jury may well draw an inference that Barrett committed a RADA offense to facilitate cheating at a major international sporting event because he facilitated cheating on PPP applications. Moreover, it strikes the Court as highly prejudicial to allow jurors to hear evidence and testimony as to Barrett's efforts to submit fraudulent loan applications to the SBA when co-Defendant Wright is not charged with any involvement in that scheme. Courts in this District have granted severance in similar circumstances. *See, e.g.*, *Parnas*, 2021 WL 2981567, at *2 (severing fraud scheme that charged only one of three defendants when there was "relatively little overlap in the trial evidence" offered between the counts); *Bezmalinovic*, 1996 WL 737037, at *5 (severing counts when overlapping proof was "minor").

### III.    Barrett's Motion to Suppress Evidence

Barrett next moves to suppress certain evidence obtained from searches of his cellphones and electronic data. Br. at 16. Barrett argues that the warrants in support of those searches were insufficiently particular and overbroad, and, in the alternative, that law

enforcement exceeded the scope of their authority in executing the warrants. *Id.* at 16-21.

Barrett also contends that the June 2022 Expansion Search Warrant authorizing the seizure of

evidence of additional crimes lacked probable cause. *Id.* at 21-22. The Court does not agree.

> The Fourth Amendment commands that:
>
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Supreme Court has held that the "essential purpose of the Fourth

Amendment [is] to shield the citizen from unwarranted intrusions into his privacy." *Jones v.*

*United States*, 357 U.S. 493, 498 (1958); *see also United States v. Galpin*, 720 F.3d 436, 445

(2d Cir. 2013) ("The central concern underlying the Fourth Amendment is the concern about

giving police officers unbridled discretion to rummage at will among a person's private

effects." (alterations adopted) (quoting *Arizona v. Gant*, 556 U.S. 332, 345 (2009))). "To

prevent such 'general, exploratory rummaging in a person's belongings' and the attendant

privacy violations, the Fourth Amendment provides that a 'warrant may not be issued unless

probable cause is properly established and the scope of the authorized search is set out with

particularity.'" *Galpin*, 720 F.3d at 445 (citation omitted) (first quoting *Coolidge v. New*

*Hampshire*, 403 U.S. 443, 467 (1971); and then quoting *Kentucky v. King*, 563 U.S. 452, 459

(2011)). "The touchstone in evaluating the permissibility of any search is 'reasonableness.'"

*United States v. Lifshitz*, 369 F.3d 173, 178 (2d Cir. 2004) (quoting *Griffin v. Wisconsin*, 483

U.S. 868, 873 (1987)).

"[T]he Warrants Clause both requires particularity and forbids overbreadth." *United*

*States v. Zemlyansky*, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013) (citation and quotation marks

omitted). "Although somewhat similar in focus, these are two distinct legal issues: (1)

whether the items listed as 'to be seized' in the warrant were overbroad because they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *United States v. Hernandez*, No. 09-cr-00625 (HB), 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010) (citations omitted). The appropriate remedy for a deficient search warrant is suppression of evidence seized in reliance upon such warrant: "The exclusionary rule generally prohibits admission at trial of evidence seized in searches deemed unreasonable under the Fourth Amendment, as well as of derivative evidence acquired as an indirect product or result of the unlawful search." *United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992) (citations omitted).

### A.   Standing

As a threshold matter, the Government argues that Barrett lacks standing to challenge the searches of his phones and electronic data. Opp. at 45-46.

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). Therefore, "[a] defendant cannot invoke the Fourth Amendment's protections unless he has a legitimate expectation of privacy against the government's intrusion." *United States v. Roy*, 734 F.2d 108, 110 (2d Cir. 1984). "When considering a claimed violation of Fourth Amendment rights, the burden is on the defendant to establish that his own rights under the Fourth Amendment were violated." *United States v. Paulino*, 850 F.2d 93, 96 (2d Cir. 1988). An inquiry into whether a defendant had a reasonable expectation of privacy in the area searched involves "two separate questions": "First, the person challenging the search must demonstrate a subjective desire to keep his or her effects private; and, second, the individual's subjective expectation must be one that society accepts as reasonable." *Id.* at 97. Therefore, to establish standing, a defendant must submit "an affidavit establishing" ownership or a

"subjective expectation of privacy" in the items searched, or "assert a privacy interest" in the items searched "in some other manner." *United States v. Dore*, 586 F. App'x 42, 46 (2d Cir. 2014) (summary order).

The Government asserts that, because Barrett "has not submitted an affidavit from someone with personal knowledge establishing a privacy interest in any of the devices and online accounts searched," he "has not established standing to challenge any of the warrants at issue." Opp. at 45. Barrett has mooted this argument. Barrett submitted a December 19, 2024 affidavit with his reply that demonstrated his privacy interest in the cellphones seized by government agents and the electronic accounts and data associated with those phones. Dkt. 55. In his affidavit, Barrett attests that he "own[s] and ha[s] a reasonable expectation of privacy in the two cellphones that were searched by the government," as well as the associated WhatsApp accounts. *Id.* ¶¶ 1-2. Barrett further attests that he "also used and had a reasonable expectation of privacy in [his] online (email, social media, cloud storage[,] etc.) accounts and data that were searched by the government." *Id.* ¶ 3. This clearly suffices to establish that Barrett had a "legally cognizable privacy interest in the searched [items] at the time of the search." *United States v. Whitehead*, No. 22-cr-00692 (LGS), 2023 WL 3934667, at *5 (S.D.N.Y. June 9, 2023) (citation omitted).

### B. Particularity of Warrant

Barrett first challenges the warrants authorizing searches of his electronic devices and associated data as "not particularized in any meaningful way" and therefore in violation of the Fourth Amendment. Br. at 19. The Court concludes otherwise.

The Warrant Clause's particularity requirement "prohibits general search warrants and requires a sufficient description of the evidence to be seized." *Hernandez*, 2010 WL 26544 at *9. "[T]he warrant must enable the executing officer to ascertain and identify with reasonable

certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992); *see also United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) ("A warrant must be 'sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize.'" (alteration adopted) (quoting *United States v. LaChance*, 788 F.2d 856, 874 (2d Cir. 1986))).  This ensures that the "decision as to what items may be seized" is not left "to the unguided discretion of the officers executing the warrant." *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990).  "[T]he particularity requirement assumes even greater importance" where, as here, electronic devices are involved, given the "scope and quantity of private information" such devices may contain. *Galpin*, 720 F.3d at 446; *see also United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) ("A general search of electronic data is an especially potent threat to privacy because hard drives and e-mail accounts may be 'akin to a residence in terms of the scope and quantity of private information [they] may contain.'" (alteration in original) (quoting *Galpin*, 720 F.3d at 446)), *abrogated on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018).

The Second Circuit has explained that the "particularity requirement has three components": "First, a warrant must identify the specific offense for which the police have established probable cause . . . .  Second, a warrant must describe the place to be searched . . . .  Third, the warrant must specify the 'items to be seized by their relation to designated crimes.'" *Galpin*, 720 F.3d at 445-46; *accord United States v. Wey,* 256 F. Supp. 3d 355, 380 (S.D.N.Y. 2017); *Ulbricht*, 858 F.3d at 99.

The warrants issued here readily satisfy the Second Circuit's particularity requirements.  The warrants identified the "specific offenses" for which probable cause existed — the distribution of adulterated and misbranded drugs in violation of the FDCA, 21 U.S.C. §§ 331, 333; a scheme to influence the outcome of a major international sports

competition through the use of prohibited substances in violation of the RADA, 21 U.S.C.

§§ 2402, 2403; and with respect to the Expansion Search Warrant, theft of government funds,

providing or possessing contraband in prison, wire fraud, and bank fraud, 18 U.S.C. §§ 641,

1791, 1343, 1344.  Moreover, the WhatsApp Warrant, Email Warrants, and iCloud Warrants

each specified particular accounts to be searched, and the Cellphone and Expansion Search

Warrants specified subject devices (for example, Barrett's cellular devices) and particular

accounts to be searched.  And all the warrants identified discrete categories of information to

be seized, pertaining to either the alleged conspiracy to distribute performance-enhancing

substances to athletes or the alleged scheme to defraud the SBA through fraudulent loan

applications to the COVID-19 PPP program.  The warrants therefore "satisf[y] the basic

elements of the particularity requirement as traditionally understood." *Ulbricht*, 858 F.3d at

101 (finding that warrant "plainly satisfie[d] the basic elements of the particularity

requirement" where it "list[ed] the charged crimes, describe[d] the place to be searched, and

designate[d] the information to be seized in connection with the specified offenses").

In asserting that the warrants nevertheless lacked particularity, Barrett points to (1) the

absence of temporal limitations and (2) the incorporation of catch-all provisions.  Br. at 18-19.

Neither argument is compelling.  With respect to temporal limitations (or the lack thereof), the

Second Circuit "has not yet addressed the impact of the absence of a time frame to the

particularity of a search warrant." *Hernandez*, 2010 WL 26544, at *11.  Courts in this

District, have, however advised that "[a] temporal limitation in a warrant is not an absolute

necessity, but is only one indicium of particularity." *Id.* (quoting *United States v. Triumph

Cap. Grp., Inc.*, 211 F.R.D. 31, 58 (D. Conn. 2002)); *see also United States v. Arias-Casilla*,

No. 21-cr-00218 (AT), 2022 WL 2467781, at *5-7 (S.D.N.Y. July 6, 2022) (holding that,

where the "warrant readily me[t] the relevant particularity requirements," "[t]he absence of a

temporal limitation alone [did] not render the [w]arrant overbroad"); *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 306-07 (S.D.N.Y. 2018) ("Like many measures of particularity, the necessity of a temporal limitation depends on the context of the case . . . ."). "The complexity and duration of the alleged criminal activities" may "render a time frame less significant than in a case that require[s] a search for a small set of discrete items related to one or only a few dates." *Hernandez*, 2010 WL 26544, at *11.

Here, the parties are not charged with a discrete transaction or event but with a conspiracy to influence the 2020 Tokyo Olympics that consisted of various overt acts, undertaken by multiple individuals, over an extended period. The affidavit supporting the Email Warrants and the WhatsApp Warrant suggests that the relationships between the relevant parties predated 2020 and extended beyond 2021. That affidavit alleges that the relevant conduct transpired "between at least in or about 2020 and in or about 2021," USAO_024104; cites the exchange of text messages as early as November 11, 2020, USAO_02411; and incorporates communications post-dating the Olympics, USAO_024116. Given the complexity of this case, and the fact that the warrants otherwise satisfy the particularity requirements, the Court declines to hold that the absence of a temporal limitation by itself renders the warrants deficient.

Barrett also overlooks that several of the warrants did in fact set forth time limitations, including the Microsoft Warrant (directing provider to collect emails sent, received, or created between July 10 and July 24, 2021), USAO_024154, the Gmail Warrant (directing provider to collect emails sent, received or created between January 9 and February 1, 2021 and between April 4 and April 11, 2021), USAO_024164, and the Bluehost Warrant (directing provider to collect emails sent, received, or created between January 9 and February 1, 2021), USAO_024169. As for those warrants that did not set forth time limitations, they were

nevertheless limited by subject matter.  For instance, the April 2022 Cellphone Warrant limited agents to collecting evidence "concerning the identity or location of the owner(s) or user(s)" of the subject devices; "[e]vidence concerning the identity or location of, and communications with, co-conspirators involved in the Subject Offenses"; "evidence concerning the distribution, sourcing, transport, development, purchase, sale, and/or transfer of performance-enhancing substances or misbranded or adulterated substances, and any related proceeds"; "[e]vidence concerning any financial transactions involving the Subject Offenses or proceeds derived from the Subject Offenses"; "[e]vidence reflecting discussions of the efficacy or testability of drugs" or "reflecting discussions of competitive sports"; and "[e]vidence reflecting the location of other evidence" of the cited federal crimes. USAO_024087-88.  "These categories were not overbroad as probable cause clearly justified seizing such evidence without temporal limitation . . . ."  *Pinto-Thomaz*, 352 F. Supp.2d at 307; *see also Arias-Casilla*, 2022 WL 2467781, at *7 ("The absence of a temporal limitation alone does not render the [w]arrant overbroad, because the [w]arrant limits seizure to items and information related only to [d]efendant's alleged narcotics-related criminal activity.").

As for the warrants' supposed catch-all provisions, Barrett argues that the warrants authorized law enforcement to seek materials "beyond evidence of the suspected crimes," including "'evidence reflecting the location of other evidence,' or evidence that might 'identify witnesses.'"  Br. at 19.  Moreover, Barrett asserts that the warrants authorized the examination of "materials that are not evidence of a crime at all, including any 'discussions of competitive sports,' and any 'discussions of the efficacy or testability of drugs,'" without further specification to "cover only unlawful or 'prohibited' substances".  *Id.*

The Court declines to find the provisions highlighted by Barrett insufficiently particular.  Barrett overlooks that the warrants were all cabined by the directive to search for

"evidence, fruits, and instrumentalities" of specific federal crimes.  Specifically, with respect to the WhatsApp Warrant, Email Warrants, and Apple Warrant, law enforcement officers were authorized to locate "any evidence, fruits, and instrumentalities of 21 U.S.C. §§ 331, 333, 2402, 2403" — the FDCA and RADA conspiracies.[5]  As to the Expansion Search Warrant, law enforcement officers were authorized to seize "evidence, fruits, and instrumentalities" of violations of 18 U.S.C. § 641 (theft of government funds), 1791 (related to providing or possessing contraband in prison), 1343 (wire fraud), and 1344 (bank fraud), in addition to evidence of the FDCA and RADA conspiracies.  USAO_024032-33.  Therefore, to the extent that law enforcement agents were directed to locate "evidence reflecting the location of other evidence" or "evidence that might identify witnesses," those categories were sufficiently bounded by the broader directive to identify evidence of specific violations.  *See, e.g.*, *United States v. Lustyik*, 57 F. Supp. 3d 213, 229 (S.D.N.Y. 2014) ("[T]he categories of items to be seized must be read together with the preceding text, which authorizes the government to seize only 'evidence, fruits, or instrumentalities' of [the specified] violation." (citation omitted)).  The same is true with respect to the provisions permitting agents to seek and seize evidence of "discussions of competitive sports" and "discussions of the efficacy or testability of drugs."  The government is only authorized to seize such communications if "there is probable cause to believe" they are evidence of a conspiracy to violate either the RADA or FDCA.  *Id.*

The form that the search warrants in this case took is a typical one and one frequently upheld by the courts: that is, the warrants "broadly describe[d] the items to be seized as

---

[5] *See, e.g.*, USAO_024151 (WhatsApp Warrant); USAO_024155 (Microsoft Warrant); USAO_024165 (Google Warrant); USAO_024170 (BlueHost Warrant); and USAO_024175 (Apple Warrant).

'evidence, fruits, or instrumentalities' of specified federal crimes," and "also set[] forth an

illustrative list of items to be seized." *Id.* at 227.  For instance, in *United States v. Riley*, the

Second Circuit found sufficiently particular a warrant authorizing the seizure of "evidence of

the offense of conspiracy to distribute controlled substances" and providing an illustrative list

of evidence to be seized thereunder, "including but not limited to, bank records, brokerage

house records, business records, safety deposit box keys or records and other items that

constitute evidence of the offenses of conspiracy to distribute controlled substances and

distribution of the same." 906 F.2d at 843.  The Second Circuit found that "the warrant

supplied sufficient examples of the type of records that could be seized," even if it left a

certain degree of discretion to the executing officers. *Id.* at 844; *see also id.* at 844-45.  The

same is true here. *See also Arias-Casilla*, 2022 WL 2467781, at *5 ("[C]ourts routinely reject

the assertion that an illustrative, but not exhaustive list of items that may be seized in a

particular category gives reviewing officers unfettered authority to seize all evidence of that

nature . . . ." (citation and quotation marks omitted)); *United States v. D'Amico*, 734 F. Supp.

2d 321, 363 (S.D.N.Y. 2010) ("Attachment A provides an exemplary list of records and other

items falling within the scope of the [w]arrant, thereby enabling the executing agents to

identify with reasonable certainty what they were authorized to seize."); *United States v.

Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) ("The reference to particular offenses and

the use of an illustrative list of items to seize sufficiently particularized the warrants.").[6]

---

[6] Where courts have found that warrants lacked particularity because they incorporate catch-
all provisions, those provisions have been exceedingly broad and wholly untethered from the
probable cause supporting the warrants. *See, e.g.*, *United States v. Bianco*, 998 F.2d 1112,
1115 (2d Cir. 1993) (warrant lacked particularity where it authorized the seizure of all
"[N]otes, Ledgers, Envelopes, Papers, and Records Containing Initials, Names, Addresses,
Dollar Amounts, Codes, Figures, and the Like: United States Currency," without further
limitation (alteration in original)), *abrogation recognized on other grounds by Galpin*, 720
F.3d 436; *United States v. Buck*, 813 F.2d 588, 590 (2d Cir. 1987) (warrant authorizing the

Barrett's insistence that the categories identified in the warrants should have been further limited is unpersuasive. The authorization to seize evidence of "discussions of the efficacy or testability of drugs" — without a further limitation providing for seizure of evidence related to unlawful or prohibited drugs only — was appropriate given the nature of the FDCA violations alleged in the underlying affidavits. The conspiracy to distribute misbranded and adulterated drugs in violation of the FDCA could readily have involved lawful drugs; indeed, a lawful drug administered without a prescription is a "misbranded" drug for purposes of the FDCA, Ind. ¶ 7. The authorization to search was therefore appropriately "limit[ed] . . . to the specific areas and things for which there [was] probable cause to search," thereby safeguarding against a "wide-ranging" general search of Barrett's electronic data. *Wey*, 256 F. Supp. 3d at 379-80; *cf. Ulbricht*, 858 F.3d at 99-100 (a warrant that "lack[s] meaningful parameters on an otherwise limitless search of a defendant's electronic media," including because it "fail[s] to link the evidence sought to the criminal activity supported by probable cause," does "not satisfy the particularity requirement" (citation and quotation marks omitted) (alterations adopted)). The same is true for the warrant's authorization to search for discussions of "competitive sports, including trainings, trials, qualifying events, competitions, or drug testing," all of which are relevant to whether Defendants acted with an intent to "influence" a major international sporting event under the RADA.

The authorities that Barrett cites do not compel a different result. Br. at 18. In *United States v. Wey*, the court invalidated search warrants that "fail[ed] to set forth the crimes under investigation," 235 F. Supp. 3d at 384, and that incorporated exceedingly "expansive

---

seizure of "any papers, things, or property of any kind relating to" the specified crime insufficiently particularized).

categories of generic documents without linkage to suspected criminal conduct," *id.* at 385

(capitalization omitted).  The warrants in *Wey* authorized seizure of "financial records,"

"notes," "memoranda," "records of internal and external communications," "correspondence,"

"audio tapes[] and video tapes," and "photographs," to name a few.  *Id.* at 386 (alteration in

original).  Entirely absent from the *Wey* warrants was any subject matter limitation or nexus to

the suspected criminal conduct.  *See id.* at 387 ("[T]he warrants authorize the seizure of

sweeping categories of materials, regardless of their potential connection (or lack thereof) to

any suspected criminal activities and limited only by the requirement that they relate in some

generalized way to the owner/occupant of the very premises subject to search.").  Likewise,

*United States v. Vilar* found a warrant insufficiently particular where the warrant issued

"nowhere . . . indicate[d] what specific acts of wrongdoing [were] being investigated" and

authorized the seizure of "all corporate records," without any limitation.  No. 05-cr-00621

(KMK), 2007 WL 1075041, at \*22, \*45 (S.D.N.Y. Apr. 4, 2007).  Those are markedly

different search warrants from the warrants at issue here.

For the foregoing reasons, the Court concludes that the warrants satisfy the Fourth

Amendment's particularity requirements.

### C.  Overbreadth

Barrett next argues that, for the same reasons that the warrants lacked particularity,

they were also improperly overbroad.  Br. at 19-20.

"A warrant that comports with the particularity requirements" may still "be defective

due to overbreadth."  *United States v. Purcell*, 967 F.3d 159, 179 (2d Cir. 2020).  The Warrant

Clause's overbreadth requirement asks whether "there exists probable cause to support the

breadth of the search that was authorized."  *United States v. Dinero Express, Inc.*, No. 99-cr-

00975 (SWK), 2000 WL 254012, at \*9 (S.D.N.Y. Mar. 6, 2000) (citations omitted).  Thus, "a

warrant is overbroad if its 'description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'" *Lustyik*, 57 F. Supp. 3d at 228 (omission in original) (quoting *Galpin*, 720 F.3d at 446).

As set forth above, the searches authorized by the warrants were sufficiently bounded. Each of the warrants for Barrett's electronic devices and electronic data sought information limited by (1) the specific crimes for which probable cause was set forth in the underlying affidavits, and (2) categories of evidence related to those identified criminal offenses. Therefore, any objection to the warrants on overbreadth grounds is without merit.

### D.  Probable Cause for June 2022 Warrant

Barrett further asserts that the June 2022 warrant application "failed to establish the required probable cause," that is, "cause to believe that Barrett had engaged in theft of government funds, providing contraband to prisoners, wire fraud, or bank fraud."  Br. at 21. According to Barrett, the "June 2022 warrant application reveals nothing more than generalized suspicion and hunches."  *Id.* at 22.  The Court finds that this argument is belied by the specific facts set forth in law enforcement officers' underlying affidavits.

"Probable cause exists when the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Bodnar*, 37 F.4th 833, 841 (2d Cir. 2022) (citation and quotation marks omitted).  "While probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity,' mere suspicion is not enough."  *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).  The Second Circuit has summarized the probable cause inquiry as follows:

> Probable cause to search a location for . . . particular items or records is demonstrated where a totality of circumstances indicates a "fair probability that contraband or evidence of a crime will be found" thereby.  This standard does

not demand "hard certainties," but it does require more than a "hunch," the latter being insufficient to support even an investigative stop. Rather, probable cause must be grounded in sufficient facts to establish the sort of "fair probability" on which "reasonable and prudent men, not legal technicians, act."

*United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (citations omitted). "In assessing the proof of probable cause, the government's affidavit in support of the search warrant must be read as a whole, and construed realistically." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998). "[C]ourts should pay 'great deference' to a magistrate judge's determination of probable cause." *United States v. Jones*, 43 F.4th 94, 109 (2d Cir. 2022) (quoting *Gates*, 462 U.S. at 236); *accord United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993).

The affidavit submitted in support of the Expansion Search Warrant sets forth sufficient facts to establish violations related to the theft of government funds from the SBA. The affidavit states that officers uncovered messages between Barrett and at least eighteen individuals discussing Barrett filing SBA loan applications on the respective individual's behalf. USAO_024021-22. Barrett and the individuals corresponded about obtaining identification and exchanged payments on an online payment services platform. *Id.* From the facts alleged, it was reasonable to infer that "Barrett [was] involved in filing SBA loan applications en masse." USAO_024025. It was also reasonable to infer that he was doing so unlawfully —Barrett, a "coach and trainer" at the time, did not have a reason to possess or process PPP applications.

Likewise, there are sufficient facts alleged in the affidavit to give rise to a reasonable inference that Barrett sought to provide contraband to an individual in prison. Officers uncovered text messages with a federal inmate, self-identifying as Franz Golding, who was seeking a Georgia State identification card. USAO_024022-23. The affidavit asserts that Barrett contacted several individuals about procuring an identification card, including CC-2,

49

whom Barrett messaged that he had "been scammed twice" and "already paid $1400." USAO_024023-24. Officers also uncovered evidence of Golding sending Barrett payments over an online payment services platform. USAO_024023.

It was therefore consistent with "common sense" for the Magistrate Judge to infer, based on these allegations, that there was a "fair probability" that further evidence of criminal activity would be uncovered on Barrett's devices. *See United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) ("Presented with a warrant application, the judge must 'simply . . . make a *practical, common-sense decision* whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a *fair probability* that contraband or evidence of a crime will be found in a particular place.'" (omission in original) (quoting *Gates*, 462 U.S. at 238)).

### E.   Method of Search

Alternatively, Barrett challenges law enforcement officers' execution of the search warrants, arguing that the "agents' review of Barrett's electronic data unlawfully exceeded the scope of what the warrants authorized." Br. at 20. According to Barrett, agents "engaged in a general rummaging through Barrett's electronic data," untethered from their authority under the March and April warrants to search for "evidence . . . related to violations of 21 U.S.C. §§ 331, 332, 2402, and 2403." *Id.* Barrett therefore moves to suppress all information and fruits gained from these allegedly unlawful searches. *Id.*

The Court finds no basis for suppressing information or evidence obtained from the searches rendered by agents pursuant to the March and April 2022 warrants. "It has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized." *United States v. Ulbricht*, No. 14-cr-00068 (KBF), 2014 WL 5090039, at

\*14 (S.D.N.Y. Oct. 10, 2014), *aff'd*, 858 F.3d 71.  These principles apply with equal force to searches of electronic data and devices.  *See Ulbricht*, 858 F.3d at 100 ("Since a search of a computer is 'akin to [a search of] a residence,' searches of computers may sometimes need to be as broad as searches of residences pursuant to warrants." (alteration in original) (citation omitted) (quoting *Galpin*, 720 F.3d at 446)); *In re a Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled by Google, Inc*., 33 F. Supp. 3d 386, 393 (S.D.N.Y. 2014) ("[W]e view it as well established that a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government."); *Arias-Casilla*, 2022 WL 2467781, at \*6 ("[C]ourts in this Circuit routinely uphold the validity of warrants that, as in this case, 'authorize searches of the entirety of a cellphone for data responsive to a warrant . . . .'" (alterations adopted) (quoting *United States v. Gatto*, 313 F. Supp. 3d 551, 560 (S.D.N.Y. 2018))).  "[T]raditional searches for paper records, like searches for electronic records, have always entailed the exposure of records that are not the objects of the search to at least superficial examination in order to identify and seize those records that are."  *Ulbricht*, 858 F.3d at 100.  That is precisely what happened here: officers, upon seizing Barrett's cellphones and reviewing the entirety of the contents therein for material specified in the search warrant, uncovered evidence of other crimes that was in plain view.[7]

---

[7] Defendants cite selectively from *Galpin* to argue that the risk that the "government may claim that the contents of every file it chose to open were in plain view" has "come to fruition in this case."  Reply at 16-17.  But *Galpin*, citing to the Ninth Circuit's decision *in United States v. Comprehensive Drug Testing, Inc*., 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc) (per curiam), *overruled in part on other grounds as recognized by Demaree v. Pederson*, 887 F.3d 870, 876 (9th Cir. 2018) (per curiam), also recognized that "[b]y necessity, government efforts to locate particular files will require examining a great many other files to exclude the possibility that the sought-after-data are concealed there."  *Galpin*, 720 F.3d at 447 (quoting

The Court recognizes the unique challenges associated with safeguarding a criminal defendant's privacy interests in electronic devices, especially given the voluminous troves of personal information stored therein. However, some degree of intrusion will be "inevitable" because "it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Id.* at 103 (quoting *United States v. Ganias,* 824 F.3d 199, 211 (2d Cir. 2016)). The Court thus finds no basis for concluding that officers' execution of the search warrants in this matter exceeded the scope of their authority pursuant to those warrants. The Court also rejects Barrett's request for a hearing to determine if the materials seized were truly in "plain view" of officers conducting the searches, instead finding that it has sufficient information from the warrants and underlying affidavits to resolve Barrett's suppression motion. *See, e.g.*, *United States v. Taylor*, No. 06-cr-00529 (JSR), 2006 WL 2789987, at *2 (S.D.N.Y. Sept. 26, 2006) (finding that "defendant . . . failed to raise a material issue warranting an evidentiary hearing" as to whether item seized was in plain view).

### F.   Good-Faith Exception

In any event, even if the warrants were not sufficiently particular or otherwise facially deficient, the Court finds that the good-faith exception to the exclusionary rule applies.

Under the so-called "good faith" exception to the exclusionary rule, "the exclusionary rule [does] not apply to evidence seized in objectively reasonable reliance on a warrant subsequently declared invalid." *George*, 975 F.2d at 77 (citing *United States v. Leon*, 468 U.S. 897, 919-21 (1984)); *accord Jones*, 43 F.4th at 111. The good-faith inquiry is "confined

---

*Comprehensive Drug Testing*, 621 F.3d at 1176). *Galpin* acknowledged that "[t]his threat demands a heightened sensitivity to the particularity requirement in the context of digital searches." *Id.* at 447. As set forth above, that requirement has been satisfied here.

to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.3. "Reasonable reliance does not," however "allow an officer to conduct a search with complete disregard of the warrant's validity because the 'standard of reasonableness . . . is an objective one, . . . [that] requires officers to have a reasonable knowledge of what the law prohibits.'" *George*, 975 F.2d at 77 (omissions in original) (quoting *Leon*, 468 U.S. at 919-20 n.20). "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance" on an otherwise deficient search warrant. *Id.* The exception applies in all but four situations:

> (1) where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient . . . that reliance upon it is unreasonable.

*United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (alterations in original) (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)).

The inquiry for this Court, then, is "whether a reasonably well-trained officer should have known" that the warrants were "impermissibly broad." *United States v. Buck*, 813 F.2d 588, 592 (2d Cir. 1987). The Court declines to so find. As set forth above, "there was at least arguable probable cause" for the warrants. *Jones*, 43 F.4th at 111. The warrants at issue outlined specific federal crimes and set forth illustrative categories of evidence connected to those crimes and the facts of the case. The absence of a specific timeframe from a subset of those warrants is not by itself sufficient to render officers' reliance on the warrants unreasonable. *See, e.g., United States v. Levy*, No. 22-cr-00062 (PAC), 2013 WL 664712, at *11 (S.D.N.Y. Feb. 25, 2013) ("For overbreadth and particularity purposes, no controlling authority requires a specific time frame. In these circumstances, it cannot be said that

executing officers should have realized a lack of date limitation constituted a facial deficiency in the Search Warrant such that reliance on it would be unreasonable."), *aff'd*, 803 F.3d 120 (2d Cir.), *and* 626 F. App'x 319 (2d Cir. 2015).  The Court therefore finds that the executing officers acted based on an "'objectively reasonable good-faith belief' that [their] conduct [was] lawful."  *United States v. Eldred*, 933 F.3d 110, 118 (2d Cir. 2019) (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)).

Barrett contends that application of the good faith exception is not warranted here because the "issuing magistrate wholly abandoned his or her judicial role and issued a general warrant."  Br. at 19-20.  But there is no evidence that three separate magistrate judges each "wholly abandoned [their] judicial role."  *Falso*, 544 F.3d at 125.  To the contrary, the fact that multiple judges independently approved the search warrants at issue cuts against finding any abdication of judicial authority.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss Count One of the Indictment is DENIED.  Barrett's motion to sever Counts One and Two from Count Three for the purposes of trial is GRANTED.  Barrett's motion to suppress evidence obtained from the search of his cellphones and electronic data is DENIED.

The Clerk of Court is respectfully directed to close the gavels at Dkts. 47 and 48.

Dated: February 3, 2025
       New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge